## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | |
|---|---|
| KENDRA HALL, | } |
| | } |
| **Plaintiff,** | } |
| | } |
| vs. | }   CASE NO. CV 06-B-1208-NE |
| | } |
| SIEMENS VDO AUTOMOTIVE | } |
| ELECTRONICS CORPORATION, | } |
| | } |
| **Defendant.** | } |

## AMENDED MEMORANDUM OPINION

This case is currently before the court on defendant Siemens VDO Automotive

Electronics Corporation's ("Siemens") Motion for Summary Judgment, (doc. 27).[1]  In her

Complaint, plaintiff Kendra Hall ("Hall") alleges the following claims against Siemens,

her employer: 1) discrimination based on race and gender, in violation of Title VII of the

Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e-2(a)(1)[2]; 2) discrimination

based on race, in violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981

("section 1981");  3) discriminatory pay, in violation of the Equal Pay Act ("EPA"); 4)

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.  Siemens contends in its Answer that it was misidentified in the Complaint as "Siemens VDO Automotive" and that its correct name is "Siemens VDO Automotive Electronics Corporation."  (Doc. 4 at 1.)

[2] Hall's Complaint only mentions discrimination based on compensation, but her Brief in Opposition to Defendant's Motion for Summary Judgment, (doc. 38), alleges discrimination based on disparate discipline and failure to promote as well.  (Doc. 1 at 6–7; Doc. 38 at 48–55.)

retaliation, in violation of Title VII;[3] 5) outrage, or intentional infliction of emotional distress ("IIED"), in violation of Alabama state law; and 6) negligent training/hiring/supervision/retention, in violation of Alabama state law.  (Doc. 1 at 6–12.)

Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that Siemens's Motion for Summary Judgment, (doc. 27), is due to be granted with respect to Hall's retaliation claim, her outrage/IIED claim, and her negligent hiring/training/supervision/retention claim, and is due to be denied with respect to her Title VII, section 1981, and EPA discriminatory compensation claims.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure ("the Federal Rules"), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Waddell v. Valley Forge Dental Associates, Inc.*, 276 F.3d 1275, 1279 (11th Cir. 2001).  The moving party bears the initial burden of demonstrating

---

[3] Neither Hall's Complaint nor her Equal Employment Opportunity Commission ("EEOC") charge specifies the statute under which she complains of retaliation, but her opposition brief clarifies that she is suing for retaliation under Title VII.  *See* Def. Ex. 32; (Doc. 38 at 62).

the absence of a genuine issue of material fact and that it is therefore entitled to judgment as a matter of law.  *See Celotex*, 477 U.S. at 323*; Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991).  Once the moving party has met its burden, Rule 56(e) of the Federal Rules requires that the nonmoving party go beyond the pleadings and show that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(e); *see also Celotex*, 477 U.S. at 324–25.  "There is a genuine issue of material fact if the nonmoving party has produced evidence such that a reasonable factfinder could return a verdict in its favor."  *Waddell*, 276 F.3d at 1279; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249.  Determining credibility, weighing evidence, and drawing legitimate inferences from the facts are all functions of the jury, *see id.* at 255; therefore, the court must accept as true all evidence favoring the nonmoving party and draw all justifiable inferences from the evidence in that party's favor.  Nevertheless, the nonmoving party need not be given the benefit of every inference but only of every *reasonable* inference.  *See Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II. <u>STATEMENT OF FACTS</u>[4]

Hall is an African-American female.  (Doc. 1 at 2.)  She graduated from Tuskegee University in 1998 with a degree in electrical engineering, and she has also received a master's degree in human resources from the Florida Institute of Technology.  *See* Def. Ex. A, Hall Dep., Jan. 23, 2007, at 18:14–20, 19:18–20:15.  Hall initially worked for Chrysler[5] as an intern for two summers (six months total) during college.  *See id.* at 30:23–31:4, 38:12–39:2, 103:12–103:15.  She began full-time employment at Chrysler upon graduating college, working as a Reliability Engineer in Plant 1, one of Chrysler's two Hunstville electronics plants.  *See id.* at 61:4–6, 66:6–12.  Hall's starting salary with Chrysler was $48,360 per year.  *See id.* at 57:10–20.  At some point, Chrysler transferred Hall to the position of Resident Engineer and to the other Huntsville plant, Plant 2, a job in which Hall was responsible for receiving and responding to customer complaints about certain products, completing an "8D report" for each incident.  *See id.* at 78:11–79:9,

---

[4] As required when evaluating a motion for summary judgment, the court states the facts and all reasonable inferences arising from them in the light most favorable to Hall, the nonmoving party. *See, e.g.*, *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997), *citing Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970) (citations omitted).

[5] Chrysler Corporation merged with Daimler-Benz AG in November 1998 and became DaimlerChrysler ("Chrysler").  In April 2004, Siemens acquired the two Huntsville, Alabama plants owned by Chrysler and offered employment to all former Chrysler employees, including Hall, at their previous Chrysler salaries.  *See* Def. Ex. A at 99:15–20; Def. Ex. B, Fain Dep., Jan. 24, 2007, at 24:22–25:10; Def. Ex. 12.  Siemens's Huntsville facility effectively became a supplier for Chrysler, and thus Siemens retained a relationship with Chrysler as one of its customers.  *See* Def. Ex. H, Walker Dep., Jan. 25, 2007, at 21:1–22:2.

88:16–96:12.  Chrysler gave Hall annual raises from 1999 to 2002, but Chrysler did not increase Hall's salary in 2003, possibly due to a salary freeze.  *See id.* at 76:2–78:4.

Hall alleges that, in 2002, she first began asking her supervisors at Chrysler about a pay increase because she learned that a white female co-worker, Seleeta Watson ("Watson"), had received a promotion and raise, while Hall remained responsible for a larger share of the workload and had been the one to train Watson.  *See id.* at 100:8–101:9, 107:3–10, 114:12–115:23.  At about this same time, at the end of 2002 or the beginning of 2003, Hall received an "excellent" performance review from her supervisor, Bill Fain ("Fain"), that included a recommendation for a promotion to the next salary grade, from Hall's initial grade, grade 8, to the next grade, grade 9.[6]  *See* Pl. Ex. 6; Def. Ex. B at 30:3–13.  Under Chrysler's policies, Resident Engineers with satisfactory job evaluations were generally eligible for promotions from grade 8 to grade 9 after five years of service.  *See* Def. Ex. A at 101:10–13; Def. Ex. B at 52:19–53:16. Because Hall began work at Chrysler in 1998, she would therefore have been eligible for this promotion by 2003 at the latest, and possibly by late 2002 if her college internships were counted toward seniority, as Hall was informed they would be.  *See* Def. Ex. A at

---

[6] Hall's initial salary grade is sometimes identified as "grade 8" and sometimes as "grade 91," while the next highest grade is referred to either as "grade 9" or as "grade 92."  This inconsistency is apparently due to a change in terminology that occurred while Chrysler still owned the Huntsville plants, and Siemens adopted the "grade 8" and "grade 9" labels after its acquisition.  *See* Def. Ex. B at 30:3–13, 105:19–106:6.  In addition, in late 2005, Siemens initiated the "CAPRI system," which uses bands rather than grades, and which designated both grades 8 and 9 as part of "Band C."  *See* Def. Ex. G, Kuykendall Dep., Mar. 28, 2007, at 27:11–20, 29:6–30:2.

102:20–103:16.  Hall never received this promotion from Chrysler's management before the Huntsville plants were sold to Siemens.  *See* Def. Ex. B at 51:4–52:9.

Before Siemens took over in April 2004, Hall went on maternity leave and then remained on Family and Medical Leave Act ("FMLA") leave due to pregnancy complications until August 2004.[7]  *See* Def. Ex. A at 121:12–122:2, 127:6–8.  Like other former Chrysler employees, Hall was offered full-time employment with Siemens, which for her, was scheduled to begin when she returned from her leave; specifically, Hall was offered the job of "Quality Planner," which held the same job responsibilities as Resident Engineer.  *See id.* at 82:14–83:3; Def. Ex. 12.  Upon her return, Hall continued working at the same plant, Plant 2, and at the same salary she had received from Chrysler the previous year: $54,080 per year.  *See* Def. Ex. A at 132:2–135:1.  Hall also continued to report to Fain, the same supervisor she had had at Chrysler.  *See id.* at 152:10–20.  At orientation on her first day of work at Siemens, Hall received a copy of Siemens's Equal Employment Opportunity ("EEO") policy, which prohibits racial and gender-based discrimination.  *See* Def. Ex. 13; Def. Ex. 14.

Siemens's initial pay policy, effective for the first year following Siemens's acquisition and described in Hall's employment offer letter, was to maintain the same

---

[7] Hall later received approval to take additional FMLA leave, during the period from April 28, 2005 to October 31, 2005, as needed for her son's office visits for recurring illnesses and immunizations.  *See* Def. Ex. 1.  It is unclear how much of this additional FMLA leave Hall actually took, but there is no indication that Hall was on leave continuously for any significant period of time after returning to work from her original maternity and FMLA leave in August 2004.

salaries that employees had been paid by Chrysler.  *See* Def. Ex. 12.  In early February

2005, Siemens announced that it would give all salaried Huntsville employees a 3% pay

increase, effective April 1, 2005, one year after the acquisition.  *See* Def. Ex. A at

160:16–161:23; Def. Ex. 17.  Immediately following this announcement, Hall complained

to Fain that her new pay, at $55,896, would still be lower than that of her co-workers; in

turn, Fain discussed these issues with his supervisor, Peter Walker ("Walker").  *See* Def.

Ex. A at 162:1–16; Def. Ex. H at 57:22–60:3.  Hall also complained directly to Walker,

who met with Hall on February 14, 2005, and who subsequently sent an email to Peter

Carozza ("Carozza"), Director of Human Resources, reporting that Hall's upcoming 3%

increase would still leave her on the "bottom side" of her salary grade, grade 8.  *See* Pl.

Ex. 30; Def. Ex. A at 167:3–11; Def. Ex. 18.  Walker also informed Carozza that Hall had

been "put in for a grade progression upgrade" by Chrysler, but that this upgrade had

"never happened."  *See* Def. Ex. 18.  Carozza replied to Walker that there was a meeting

planned "to discuss special situations similar to Ms. Hall's."  *See id.*  Hall sent follow-up

emails to Walker on March 15 and March 23, 2005, to which Walker replied that he had

received no response from the human resources department, and also indicated that Hall's

lack of promotion was Chrysler's fault, not Siemens's, stating, "I cannot help what

Daimler Chrysler did to us."  *See id.*  In Hall's reply to Walker, on March 28, 2005, Hall

reiterated her complaints and also pointed out that she had begun asking about her

promotion while still with Chrysler, from the exact same supervisors.  *See id.*

By August 2005, Hall had learned that Siemens was planning to hire a new Quality Planner at salary grade 9. *See* Pl. Ex. 44. On August 2, 2005, Hall sent a letter to Jessie Patterson ("Patterson"), Hall's then-supervisor and an African-American female, asking that Hall's pay equal or exceed that of the new hire. *See id.* At around that same time, Hall also spoke with Kevin Kuykendall ("Kuykendall"), the acting human resources manager, and notified him that she felt she was not being fairly compensated. *See* Def. Ex. G at 18:15–20:9. Kuykendall reviewed Hall's salary grade and dates of employment and determined that "Hall's salary was lower than it could possibly be," thus making a recommendation to Carozza and Walker that Hall receive an increase. *See id.* at 20:12–21:3. Kuykendall further found that Hall was in a lower pay grade than all the other Quality Planners. *See id.* at 21:16–19.

On August 5, 2005, before any response was given to Hall about her inquiries, Walker sent an email to Kuykendall, thanking him for his assistance in "the matter involving Mrs. Washington-Hall," and describing the management's plan to "[b]ring Kendra up to the bottom or base as [Kuykendall had] stated and then we will launch the PIP process." *See* Pl. Ex. 69. Walker also told Kuykendall that "Mr. Bill Fain and Mr. Greg Jacks are assembling documentation and records of the performance related deficiencies." *See id.*

On August 17, 2005, Hall forwarded to Walker the email she had sent him on March 28, 2005, asking him to address her earlier unanswered questions about a

promotion and raise.  *See* Pl. Ex. 68.  Walker replied that her concerns were being

reviewed by the human resources department and that Hall should hear a response by the

following week.  *See id.*   Walker then forwarded Hall's email to Kuykendall, noting the

need for immediate action and reiterating the management's plan: "The conversation of

bringing [Hall] closer to the lower end is the immediate direction.  The PIP process

should follow.  Although documented evidence in most of this is non-existant[sic] the

truth will shortly come out when she fails to perform under this process."  *See id.*

On August 22, 2005, Hall received a "Job Classification" memorandum informing

her that she was being promoted from salary grade 8 to grade 9 and being given a 9.8%

raise, retroactively effective July 1, 2005.  *See* Pl. Ex. 21.  Hall's salary thus increased to

$61,368 per year, approximately $2,000 above the minimum salary for a Grade 9 Quality

Planner.  *See id.*  The 9.8% increase was consistent with Siemens's practice of giving

8–10% pay increases for promotions, but even after this raise, Hall remained the lowest

paid Quality Planner.  *See* Def. Ex. G at 55:16–56:4, 56:21–57:1.

Despite the promotion and raise, Hall remained suspicious that her co-workers

were earning substantially more for the same job, so she complained directly to

Kuykendall about her salary in an email on August 29, 2005, with a follow-up email on

September 7, 2005, asking what factors were considered in setting compensation.  *See* Pl.

Ex. 67.  Kuykendall told Hall that he would respond, but as of February 2006, when Hall

next wrote to him, he had not provided her with her requested compensation factors.  *See*

9

*id.*  On or about September 13, 2005, Fain saw Hall eating a sandwich from a Steak-Out restaurant and commented: "[I]f I knew you were going to waste your money on Steak-Out, I wouldn't have given you a raise."  *See* Def. Ex. A at 338:20–339:14; Pl. Ex. 27.

On October 17, 2005, Walker transferred Hall from Patterson's supervision back to Fain's.  *See* Def. Ex. A at 207:1–8; Def. Ex. B at 120:10–12; Pl. Ex. 67.  Hall asked Patterson if there was a problem that necessitated this change, but Patterson replied that there was not.  *See* Def. Ex. A at 205:15–21, 207:1–8.  In response to the switch, Fain sent an email to Kuykendall stating, "My time has come.  I must get the PIP in place."  *See* Pl. Ex. 67.

On October 21, 2005, Hall's supervisors presented her with a 75-day Performance Improvement Plan ("PIP"), which identified three areas needing improvement.  *See* Def. Ex. 26.  The PIP also informed Hall about the steps required to meet the desired results, and noted that these improvements necessitated immediate attention.  *See id.*  When Hall asked why she was being placed on the PIP, she was told that there had been complaints about her work,[8] but she was not given the names of those who made the complaints.  *See*

---

[8] The issues Siemens identifies in its brief as Hall's "performance issues" and the reasons for giving her the PIP are:

> a) slow response time, as observed by Fain, *see* Def. Ex. B at 68:12–14;
> b) complaints to Fain from: Richard Payne ("Payne"), the Factory Focus Manager at Siemens's Huntsville Plant 2; Marty Ziegler, a contract employee at a Chrysler plant in Delaware; and Randy Coltrin, a Quality Manager for Chrysler in Detroit, *see id.* at 61:3–80:21;
> c) observations by Payne that Hall's 8D reports were often late or incomplete, and that Hall did not follow up adequately on quality issues or effectively coordinate responses to quality issues raised by Chrysler, *see* Def. Ex. K,

Def. Ex. A at 265:18–266:13.  Hall was aware, however, that at some point prior to the

PIP, at least one person, Marty Ziegler, had complained specifically about Hall's failure

to provide timely 8D reports.  *See id.* at 267:13–268:16.  Accompanying the PIP was a

letter notifying Hall that she had "performance issues" and that "if there is not significant

and sustained improvement in your performance, disciplinary action up to and including

termination may be taken."  *See* Def. Ex. 26.  In response to receiving the PIP, Hall sent

an email to Walker, Fain, Patterson, and Kuykendall stating that she had been working

---

Payne Decl., at ¶ 3;

d) complaints to Ben Parkerson ("Parkerson"), the plant liaison at Plant 2, from Ziegler and Steve Karalis, an employee of a Chrysler plant in Michigan, stating that they "need[ed] information that was not being supplied to them in a timely manner," *see* Def. Ex. C, Parkerson Dep., Jan. 24, 2007, at 31:13–18;

e) complaints to Walker by Simon Kissonergis, a Chrysler employee, that Hall's performance was a "disgrace" and "very unprofessional" and that Siemens should "have somebody on the phone next time that knows what they are doing," *see* Def. Ex. H at 60:12–17, 95:16–96:15;

f) "numerous" complaints from Ziegler that Hall was "often unavailable," "would not return emails and phone calls," and that her 8D reports were "vague, incomplete, inaccurate, and frequently late," *see* Def. Ex. I, Ziegler Decl. at ¶ 3;

g) complaints from Karalis about Hall's 8D reports and responsiveness, *see* Def. Ex. J, Karalis Decl., at ¶ 4;

h) complaints from Mr. Bob Small, another Chrysler employee, that Hall was "frequently unavailable" and "slow to respond," that she "did not have a sense of urgency" regarding matters that he considered important, that her 8D reports were "rarely submitted on time" and often incomplete once submitted, and that he had the most problems with Hall of all the Siemens Quality Planners, so that due to these issues, he "work[ed] around" Hall, *see* Def. Ex. L, Small Decl., at ¶¶ 3–4.

(Doc. 27 at 10–12.)  Hall generally denies these complaints and their numerosity or attributes them to the entire Quality Planning team.  (Doc. 38 at 7–9.); *see* Def. Ex. C at 44:15–45:10; Def. Ex. H at 96:21–100:15; Doc. 35-3, Patterson Dep., Mar. 26, 2007, at 76:6–77:1, 95:15–101:12.

fewer hours because of her marriage and new baby, but she asserted that the quality of her work had not changed. *See* Def. Ex. 28. Moreover, Hall had not previously been notified by her supervisors of any performance or disciplinary issues, although she had received one informal disciplinary warning from Fain due to attendance issues in early 2005. *See* Def. Ex. A at 348:20–349:2; Def. Ex. B at 43:19–47:17.

To ensure compliance with the PIP, Fain met with Hall on a daily basis. *See* Def. Ex. B at 156:22–157:4. On October 24, 2005, three days after the issuance of the PIP, Siemens sent Hall to Mexico for three days to speak directly with a customer about quality issues with certain Siemens products over which Hall was responsible. *See* Def. Ex. A at 258:16–259:2, 285:15–287:12; Def. Ex. 28. Hall indicated in an email to Walker, Fain, Patterson, and Kuykendall that she viewed the Mexico trip as a positive action, asking her supervisors how her performance could be poor if she was being asked to represent Siemens with a customer in Mexico. *See* Def. Ex. 28. Fain, Walker, and Kuykendall all met with Hall for two comprehensive reviews during the PIP's term, once on November 21, 2005, 30 days after the PIP was issued, and again after approximately 75 days, on January 4, 2006, although this second review was supposed to take place after 60 days. See Def. Ex. 29; Def. Ex. 31.

At some point around the time the PIP was initiated, Hall was told by two of the technical customer service ("TCS") employees with whom she worked, Karalis and John Lally ("Lally"), that Parkerson had asked them if they had any issues with her work. *See*

12

Def. Ex. A at 343:11–23.  In addition, the very same day as Hall was given the PIP, on the

afternoon of October 21, 2005, Walker sent an email to Payne seeking correspondence

from customers that "shows displeasure for Ms. Washington-Hall's performance."  *See*

Pl. Ex. 2.  Walker subsequently sent an email to Lally and Ed LaMantogue, on November

14, 2005, seeking "evidence of dissatisfaction towards Kendra Washington-Hall."  *See*

Def. Ex. 35.  Lally has submitted an affidavit attesting that he had no complaints about

Hall's work and that he informed Parkerson of that fact, and that when Lally asked

Parkerson why Walker had sent the email soliciting complaints, Parkerson responded that

Hall was "on her way out because she had pulled the race card."  *See* Pl.'s Evidentiary

Submission, Part III.

 Hall filed an EEOC charge of discrimination on November 15, 2005, alleging

racial and gender-based discrimination, retaliation, and a violation of the EPA.  *See* Def.

Ex. 32.

 Siemens provided pay increases to all qualified Huntsville employees on January

1, 2006.  *See* Def. Ex. F at 256:6–13.  Due to a company policy making all employees on

PIPs ineligible for pay increases, Hall was not eligible for any pay increase until she

completed the PIP.  *See id.* at 256:4–12.  Just before Hall was scheduled for her final PIP

review in early February 2006, which was more than 100 days after the PIP began, she

was sent to Mexico a second time.  *See* Def. Ex. A at 305:11–20.  Upon Hall's successful

completion of the PIP, in mid-February, Siemens gave her a 9.5% raise, retroactive to

January 1st, which increased Hall's salary to $67,236.83 per year.  *See* Def. Ex. B at

161:1–5; Def. Ex. F at 255:4–12; Pl. Ex. 78.  Of this 9.5%, Siemens identified 3.5% as a

merit raise for Hall's completion of the PIP, and the remaining 6% as an equity

adjustment.[9]  *See* Pl. Ex. 78.  Carozza acknowledged in an email to Hall that the equity

component of the pay increase was "designed to bring [Hall] more in line with the salary

of [her] peers and further reduce the gap caused by Chrysler."  *See id*.  Denying that the

raise had anything to do with Hall's recently filed EEOC charge, Carozza also noted that

the equity increase was a "continuation of the process we started in July, 2005 when you

first brought your particular pay situation to our attention . . . ."  *See id.*

        In June 2006, Hall was transferred to a Quality Planner position in the "OES"

Division in Plant 1; the transition was complete by July 1, 2006.  *See* Def. Ex. A at

322:7–17.  The alleged reason for the transfer was that Plant 2 was closing, but Hall knew

that some employees had remained at Plant 1.  *See id.* at 319:2–322:6.  Instead, Hall

points to testimony from Carozza suggesting that there were rumors of plans to get rid of

the OES Division, the division into which Hall had been transferred.  *See* Def. Ex. F at

294:21–298:9.  Plant 2 is a nicer facility than Plant 1, and Hall has not objected to

working in Plant 1.  *See* Def. Ex. A at 68:1–17.  Hall claims that her new supervisor,

_____

        [9] According to Carozza, Siemens used equity adjustments to ensure that employees' salaries
were commensurate with their experience and the value they added to the company.  *See id.* at
245:1–12.

14

Ingrid Gericke ("Gericke"), is known to be difficult, but Hall admits that Gericke has done nothing discriminatory. *See id.* at 323:1–8, 326:2–327:3.

At the beginning of 2007, Hall received another round of merit and equity raises. *See id.* at 251:7–15. Her salary as a result of these raises, then, was $73,502.34 per year. *See id.* at 252:17–23.

**Hall's Comparators**

1) Gayle Burch ("Burch"): Burch was the new hire about whom Hall had heard in August 2005. *See* Def. Ex. A at 215:11–16. She is female and identifies her race as "Caucasian with Native American bloodlines." *See* Def. Ex. E, Burch Dep., Mar. 26, 2007, at 6:9–15. Burch was hired by Siemens at a salary of $72,060 per year (at a time when Hall's salary was $61,368); Burch's salary with her previous employer had been approximately $80,000. *See* Def. Ex. D, Burch Decl., at ¶ 2.[10] Burch received a chemical engineering degree from the University of South Alabama in 1989, and she is a certified Quality Auditor by the American Society for Quality. *See* Pl. Ex. 51; Def. Ex. E at 9:14–18. Prior to joining Siemens, Burch had worked in quality management for several other companies. *See id.*

2) Jeff Hall ("Mr. Hall") (no relationship to plaintiff Hall): Mr. Hall is a white male who was hired by Siemens in February 2005 as a Quality Engineer, and who was

---

[10] Burch accepted the job at Siemens despite lower pay than her previous employment because of different benefits and the opportunity to work for a larger, more established company. *See* Def. Ex. D at ¶ 3.

then promoted to the position of Quality Planner in October 2005 at a salary of $70,008 per year, when Hall was earning $61,368.  *See* Def. Ex. B at 115:11–143:20; Pl. Ex. 12; Pl. Ex. 13; Def. Ex. M.  Mr. Hall is a 1983 graduate of the U.S. Naval Academy with a degree in applied science; he also has an M.B.A. from the University of Central Florida. *See* Pl. Ex. 12.

3) Robert Hagood ("Hagood"): Hagood is a white male who was hired by Siemens in February 2005 at a salary of $74,124, when Hall's salary was still frozen at $54,080. *See* Pl. Ex. 73; Def. Ex. G at 297:22–298:14; Def. Ex. M.  Hagood has a bachelor's degree in mechanical engineering, is a certified quality engineer by the American Society for Quality, and had held several previous jobs as an engineer before applying to Siemens.  *See* Def. Ex. U.

4) John Paynter ("Paynter"): Paynter is a white male who was hired in July 2004 as a Production Supervisor, at a salary of $65,004, and who was then promoted to the position of Quality Planner in May 2005 at a salary of $74,124, when Hall was earning $55,896.  See Pl. Ex. 72; Def. Ex. G at 291:5–297:12; Def. Ex. M.  Paynter has a bachelor's degree in interdisciplinary science with an emphasis on technology management, as well as thirteen years' service in the United States Air Force and several previous jobs in various large corporations.  *See* Def. Ex. U.

5) Vestor Lee Pinson ("Pinson"): Pinson is a white male who had worked with Chrysler, and then Siemens, since 1984, giving him fourteen years' seniority over Hall.

*See* Def. Ex. M.  Pinson was promoted to the position of Quality Planner in July 2005 at a salary of $79,572, when Hall's salary was retroactively raised to $61,368.  *See* Pl. Ex. 35.

## III. DISCUSSION

### A. Title VII Discrimination Claim

#### 1. Discriminatory Conduct at Issue

Siemens characterizes Hall's Title VII claim as alleging racial and gender-based discrimination in compensation; Hall's brief, however, argues that Siemens discriminated against her not only by compensating her less than similarly situated white and/or male employees, but also by failing to promote her and by disciplining her differently than her peers for the same conduct.  (Doc. 38 at 48–58.)  After combing Hall's Complaint and EEOC charge, the court does not find either of the latter two issues — failure to promote and disparate discipline — were sufficiently pled or alleged in these documents to be actionable.  (Doc. 1 at 6–8); *see* Def. Ex. 32.  As a result, the court limits Hall's Title VII claim to her allegations of discriminatory compensation and will only address whether Hall has raised a genuine issue of material fact as to why she was compensated less than similarly situated employees who are not in a protected class.

#### 2. Standard for Title VII Liability

Title VII makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to [her] compensation . . . because of

17

such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-

2(a)(1).  When a plaintiff, as in this case, offers only circumstantial evidence to prove a

Title VII discrimination claim, courts use the burden-shifting framework established by

the Supreme Court in *McDonnell Douglas Corp. v.* Green, 411 U.S. 792 (1973) and

*Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this

framework, the plaintiff must first prove a *prima facie* case, creating a presumption of

discrimination, by showing that she was a qualified member of a protected class and was

subjected to an adverse employment action in contrast with similarly situated employees

outside the protected class.  *See McDonnell Douglas*, 411 U.S. at 802; *Vessels v. Atlanta*

*Indep. Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir. 2005).  Once the plaintiff has proven a

*prima facie* case, the burden shifts to the defendant to articulate one or more legitimate,

nondiscriminatory reasons for its employment action.  *See Burdine*, 450 U.S. 248, 253

(1981).  If the defendant accomplishes this, the burden shifts back to the plaintiff to prove

by a preponderance of the evidence that the defendant's alleged reason or reasons were a

pretext for unlawful discrimination.  *See id.*

### a. *Prima Facie* Case

Hall has established a *prima facie* case for both racial and gender-based

discrimination.  As an African-American female, she is a member of both a racial and

gender minority and thus of a qualified protected class.  Hall has provided ample evidence

that she repeatedly asked for pay raises from her supervisors, and that despite some

attempts by Siemens to elevate her salary, Hall remained the lowest-paid Quality Planner, receiving a salary that was significantly less than several similarly situated co-workers who were not members of a protected class, including Burch, Hagood, Mr. Hall, Paynter, and Pinson.  By denying Hall as substantial a raise as would bring her salary in line with that of her non-minority peers, Siemens subjected Hall to an adverse employment action that was not imposed on similarly situated, non-minority employees.  Because Hall is a member of a protected class and the record clearly shows that her compensation was consistently maintained at a lower level than her peers, Hall has established a *prima facie* case and has created a presumption of both racial and gender-based discrimination that Siemens must rebut with a legitimate, nondiscriminatory reason for the obvious pay differentials.

### b. Legitimate, Nondiscriminatory Reasons

Siemens argues that it had legitimate, nondiscriminatory reasons for setting the salaries of similarly situated Quality Planners at levels higher than Hall's because it "based the salaries of its new hires on such things as education, professional certifications, relevant work experience, the need to fill the position and individual negotiations."  (Doc. 42 at 13–14.)  Siemens does not allege a legitimate, nondiscriminatory reason for giving its veteran employees, such as Pinson, a higher salary than Hall, though the court notes that Pinson's fourteen years' greater seniority over Hall is evident from the record and is a legitimate, nondiscriminatory reason for paying Pinson

19

more.  The court acknowledges that, if demonstrated by *evidence*, the factors identified by Siemens might indeed qualify as legitimate, nondiscriminatory reasons for paying similarly situated employees differently.  With the exception of Pinson, however, the court does not find that Siemens has produced sufficient *evidence* from decisionmakers, with declarations, or deposition testimony, that any of these legitimate, nondiscriminatory factors actually did contribute to the calculation of the other four comparators' salaries.

Burch, for example, was paid more at her previous company than she was offered at Siemens, perhaps suggesting that Siemens offered Burch a higher salary than it paid Hall in order to attract Burch to the position, but there is no testimony that Burch's salary decision definitely was reached in this fashion, and even Burch testifies that she chose Siemens for reasons other than salary.  Similarly, there is no testimony or other obvious evidence in the record illustrating that the qualifications or experiences of Mr. Hall, Paynter, and Hagood were, in fact, the reasons that they were offered a higher starting salary than that which Hall was being paid at the time they were hired.

### c. Pretext

Because Siemens has not shown that legitimate, nondiscriminatory reasons were used in setting the salaries of all the comparators (except Pinson) at a level higher than Hall's, a genuine issue of material fact remains as to Siemens's motivations for the

salaries, so summary judgment is due to be denied.[11]  The court does not have to decide the issue of whether Hall has proven that Siemens's proffered reasons were a pretext for unlawful discrimination because Siemens has failed to meet its burden of production; nevertheless, the court notes that Hall has produced evidence that Siemens's reasons were pretextual.  First, there is an inference of pretext in Siemens's unreasonable delay in responding to Hall's request for a raise and in continuously denying her compensation equivalent to that of her peers, especially after admitting that her salary had been kept unreasonably low for her position by Siemens's predecessor, Chrysler.  Second, Hall has demonstrated that any contention that Hall had performance problems is likely a mere post-event justification for keeping her salary low, as evidenced by the clear attempt by Hall's supervisors to drum up complaints about Hall's performance *after* they had decided to issue the PIP.  Thus, even if Siemens had produced a legitimate, nondiscriminatory reason, summary judgment would still be due to be denied because Hall has created a genuine issue of material fact as to whether Siemens's proffered reasons were pretextual.

## B. Section 1981 Racial Discrimination Claim

Section 1981 of the Civil Rights Act of 1991, like Title VII, prohibits an employer from discriminating against an employee, but it is limited to discrimination based on race.

---

[11] With regard to Pinson alone, the court finds that Hall has not offered sufficient evidence of pretext as to Siemens's legitimate, nondiscriminatory reasons for the difference in Hall's and Pinson's compensation, that is, Pinson's fourteen years of seniority over Hall.  Thus, at trial, Hall may not use Pinson as a comparator in her Title VII, section 1981, or EPA claims.

*See Holiness v. Moore-Handley, Inc.*, 114 F.Supp.2d 1176, 1181 (N.D.Ala. 1999).

Because of their similarity, both statutes have the same standard of proof and the same

analytical framework.  *See Standard v. A.B.E.L. Services, Inc.*, 161 F.3d 1318, 1330 (11th

Cir. 1998).  Consequently, the court applies the discussion above regarding Hall's Title

VII claim to Hall's section 1981 claim and decides summary judgment equivalently:

summary judgment is due to be denied as to Hall's section 1981 claim because there

exists a genuine issue of material fact as to whether Siemens's had a legitimate,

nondiscriminatory reason for paying Hall less than other similarly situated employees

who were not members of a protected class.

## C. EPA Claim

### 1. Standard

The EPA prohibits gender-based discrimination under a different standard than

Title VII.  A plaintiff suing under the EPA must make a *prima facie* case by showing that

her employer paid her less than a male co-worker "for equal work on jobs the

performance of which requires equal skill, effort, and responsibility, and which are

performed under similar working conditions." *See* 29 U.S.C. ß 206(d)(1); *Corning Glass*

*Works v. Brennan*, 417 U.S. 188, 191 (1974); *see also Irby v. Bittick*, 44 F.3d 949, 954

(11th Cir. 1995).  The plaintiff does not have to show that the jobs held by the

comparators are identical to hers, just that they are "substantially equal."  *See Miranda v.*

*B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992).  Likewise, the EPA

22

compares the jobs and not the employees, so it is the skills and qualifications actually needed to perform the job, and not the skills and qualifications of the employees themselves, that are considered. *See id.* Job titles are "entitled to some weight in this evaluation," but "'the controlling factor is job content' — the actual duties that the respective employees are called upon to perform." *See id.* (quoting *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 (5th Cir.), *cert. denied*, 414 U.S. 822 (1973)).

If the plaintiff establishes a *prima facie* case, the defendant must then raise one of four affirmative defenses and prove by a preponderance of the evidence that plaintiff's pay is the result of: 1) a seniority system; 2) a merit system; 3) a system which measures earnings by quantity or quality of production; or 4) any factor other than sex. 29 U.S.C. § 206(d); *see also Irby*, 44 F.3d at 954. If the defendant fails to convince the trier of fact, the plaintiff wins. *Meeks v. Computer Assoc. Int'l*, 15 F.3d 1013, 1018 (11th Cir. 1994). If the defendant does convincingly raise an affirmative defense, however, the plaintiff must present affirmative evidence that the defense is a pretext or post-event justification for a gender-based differential. *See Irby*, 44 F.3d at 954. If the plaintiff is able to create an inference of pretext, there is a genuine issue of material fact for trial and summary judgment must be denied. *Id.*

### a. *Prima Facie* Case

Hall presents substantial evidence that Siemens paid her less than four male co-workers — Hagood, Mr. Hall, Paynter, and Pinson — for equal work as Quality Planners

in Siemens's Huntsville facility.  Although the equivalency of the job title itself is not controlling, Hall has shown that, as Quality Planners, she and the four male comparators were all required to perform essentially the same duties, providing quality control on Siemens electronics products in response to customer complaints.  In her brief, Hall stresses the salary difference between her and Mr. Hall, who, at the time he was promoted to the position of Quality Planner in October 2005, was paid nearly $9,000 more than Hall, earning $70,008 to her $61,368.  The personnel files in the record also demonstrate that the salaries paid to Hagood, Paynter, and Pinson were substantially higher than Hall's when each was performing equivalent job duties.  Consequently, because the evidence clearly shows that Hall was paid less than all four male comparators who were performing equal work for jobs that required equal skill, effort, and responsibility, and which were performed under similar working conditions, Hall has established a *prima facie* case under the EPA.

### b. Siemens's Affirmative Defense: Factor Other Than Sex

Siemens pleads in its Answer the "catch-all" affirmative defense of "a factor other than sex" to explain any differences in compensation between Hall and male employees. (Doc. 4 at 16; Doc. 27 at 25–26.)  Specifically, Siemens emphasizes that Hall's salary was originally set in the same manner as all other former Chrysler employees, by matching the salary that the employees had been paid by Chrysler.  (Doc. 27 at 26.)  Siemens therefore asserts that its pay-setting decisions were based on prior pay and on "a desire to obtain

continuity of the workforce in its acquisition," and not on any consideration of gender. (*Id.*)  In making this argument, however, Siemens apparently overlooks the fact that it only maintained the old Chrysler salaries for a period of one year after acquisition, until April 2005, and that all of the comparators except for Pinson were hired after Siemens's acquisition, so their salaries could not have been influenced by this workforce continuity factor.

Siemens also bases its conclusion that prior pay constitutes a sufficient "factor other than sex" on a misreading of the controlling law, because according to the Eleventh Circuit, "prior salary alone cannot justify pay disparity under the EPA."  *See Irby*, 44 F.3d at 955 (internal quotation marks omitted).  Instead, "[t]he question is whether other business reasons . . . reasonably explain the utilization of prior salary."  *Id.* (internal quotation marks omitted).  "Other business reasons" include, among other things, experience and seniority.  *Id.* at 955–56.

In its brief, Siemens notes the fact that Mr. Hall's salary was based on his compensation in his pre-Quality Planner position, which was high because in that position Mr. Hall was eligible for overtime.  (Doc. 27 at 26.)  Siemens cites to no testimony from a decisionmaker that there were any other reasons besides this prior pay that Mr. Hall was paid more as a Quality Planner than Hall.  Under *Irby*, the prior pay factor is insufficient on its own.  In addition, at oral argument on this motion, Siemens asserted that Paynter was paid more in order to attract him from his previous employer, but there is no evidence

in the record from any decisionmaker to support this allegation.  Just as the court faulted

Siemens for a lack of evidence in the Title VII discussion above, the court finds here that

Siemens has not provided sufficient supporting *evidence* for its contention that there were

factors other than sex, and particularly additional business justifications other than prior

pay, used in setting the comparators' salaries, with the exception of Pinson.  The court

therefore concludes that there remains a genuine issue of material fact as to whether

Siemens has established a "factor other than sex" affirmative defense to Hall's EPA

claim, and that summary judgment is due to be denied for Hall's EPA claim.  The court

does not reach the issue of whether Hall has proven that Siemens's alleged factors other

than sex were a pretext for discriminatory pay, but the court recognizes that the same

evidence of pretext discussed above with regard to Hall's Title VII and section 1981

claims is relevant to Hall's EPA claim as well.

**D. Title VII Retaliation Claim**

    **1. Standard**

    In order to establish a *prima facie* case for retaliation under Title VII,[12] a plaintiff

must show that: 1) she engaged in protected activity; 2) she suffered an adverse

---

[12] Title VII's retaliation provision provides, in relevant part:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment…because [the employee] has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a).

employment action; and 3) there was a causal link between the protected activity and the employment action. *Stavropoulous v. Firestone*, 361 F.3d 610, 616 (11th Cir. 2004).   If the plaintiff establishes a *prima facie* case, the burden then shifts to the defendant to articulate a legitimate reason for the adverse employment action. *Brochu v. City of Rivera Beach*, 304 F.3d 1144, 1155 (11th Cir. 2002).  "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Id.*

In order to prove the first element, that a plaintiff engaged in "protected expression," the plaintiff must demonstrate that she "had a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Weeks*, 291 F.3d at 1311 (internal quotation marks omitted).  "Protected activity" includes not only the filing of complaints with the EEOC, but also informal complaints to superiors and the use of employers' internal grievance procedures. *See Johnson v. Booker T. Washington Broadcasting Svc., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000); *Rollins v. State of Fla. Dep't of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  The merit of the employee's complaint does not matter "so long as she can show a good faith, reasonable belief that the challenged practices violate Title VII." *Rollins*, 868 F.2d 397 at 400.  The protected activity and the adverse employment action must be close in time, generally taking place within fewer than three months of each other. *See, e.g.*, *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (finding three months between the protected activity and the alleged adverse employment action insufficient to establish causation in a Title

VII retaliation claim); *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004) (citing courts that have found one month sufficient and three months insufficient for causation).

The Supreme Court recently clarified the definition of an "adverse employment action" for the purposes of a Title VII retaliation claim to ensure that this element was not limited solely to actions that affect employment or workplace conditions. *See Burlington Northern & Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2409 (2006). Preferring an objective standard, the Court held that Title VII's anti-retaliation provision "covers those (and only those) employer actions that would have been materially adverse to a reasonable employee or job applicant." *Id.*   The Court therefore concluded that "[i]n the present context that means that the employer's actions must be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Id.*

In *Burlington Northern*, the Court further explained that "whether a particular [employment action] is materially adverse depends upon the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position considering all the circumstances." *Id.* at 2416.  For example, "[a] schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school age children." *Id.* at 2415.  The Court noted, however, that it "refers to '*material* adversity' to separate significant from trivial harms." *Id.* at 2407 (emphasis in original).  Trivial harms,

according to the Court, include "petty slights or minor annoyances that often take place at

work and that all employees experience."  *Id.* at 2415.

With respect to negative performance evaluations, in particular, the Eleventh

Circuit has opined that:

> Employer criticism, like employer praise, is an ordinary and
> appropriate feature of the workplace.  Expanding the scope of
> Title VII to permit discrimination lawsuits predicated only on
> unwelcome day-to-day critiques and assertedly unjustified
> negative evaluations would threaten the flow of
> communication between employees and supervisors and limit
> an employer's ability to maintain and improve job
> performance.  Federal courts ought not to be put in the
> position of monitoring and second-guessing the feedback that
> an employer gives, and should be encouraged to give, an
> employee.  Simply put, the loss of prestige or self-esteem felt
> by an employee who receives what he believes to be
> unwarranted job criticism or performance review will rarely
> — without more — establish the adverse action necessary to
> pursue a claim under Title VII's anti-discrimination clause.

*Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1242 (11th Cir. 2001).  Furthermore, in

*McAdams v. Harvey*, the Eleventh Circuit decided not to alter its opinion affirming

summary judgment as to a retaliation claim based on a performance evaluation upon

instructions from the Supreme Court to reconsider the previous judgment in light of

*Burlington Northern*'s "materially adverse" standard.  *See* 141 Fed. Appx. 926, *reh'g and*

*reh'g en banc denied*, 253 Fed. Appx. 924 (11th Cir. 2007), *on remand from* 141 Fed.

Appx. 802 (11th Cir. 2005), *cert. granted, judgment vacated by* --- U.S. ----, 126 S. Ct.

2980, 165 L. Ed. 2d 984 (2006).

29

Courts since *Burlington Northern* have also held that, in their specific cases, neither a PIP nor a performance improvement discussion ("PID") was sufficiently materially adverse to a reasonable employee to be considered an adverse employment action. *See Bazemore v. Ga. Tech. Auth.*, No. 05-1850, 2007 WL 917280, at *3–*4 (N.D. Ga. March 23, 2007) (finding that a PID was not, by itself, an adverse employment action because it was not part of any formal disciplinary process and did not trigger any formal discipline); *Holliday v. Comcast Cable Commc'ns, LLC*, No. 05-2554, 2007 WL 551514, at *8 (E.D. Pa. Feb. 16, 2007) (assessing a written warning to plaintiff, placement of plaintiff on a PIP, and the extension of plaintiff's term on the PIP as not materially adverse to plaintiff or a reasonable employee because plaintiff's compensation remained the same, plaintiff was not denied any promotions or transfers, and plaintiff was taken off the PIP upon successful completion).

The third and last element of a retaliation claim, a causal relationship between the protected expression and the adverse employment action, is "construed broadly so that a plaintiff merely has to prove that the protected activity and the . . . [adverse] action are not completely unrelated." *Higdon v. Jackson*, 393 F.3d 1211, 1220 (11th Cir. 2004). One common way a plaintiff can satisfy this element is with circumstantial evidence of causality, that is, by providing sufficient evidence of an employer's knowledge of the protected expression and that a "close temporal proximity" exists between this knowledge and the adverse action. *See id.* While the Eleventh Circuit has held that a period as much

30

as one month may suffice as "close temporal proximity," *see Higdon*, 393 F.3d at 1220,

the Supreme Court has cited with approval cases finding that as few as three months did

not, *see Clark Cty. Sch. Dist.*, 532 U.S. at 273–74.

### 2. Hall's *Prima Facie* Case

#### a. Protected Activity

Hall clearly engaged in a protected activity when she filed her EEOC charge on

November 15, 2005.[13]  With respect to alleged adverse employment actions that took

place *after* November 15, 2005, then, Hall has demonstrated that she had a good faith,

reasonable belief that Siemens's pay structure violated Title VII.  The court recognizes

that Hall has argued in her brief and in oral argument that Siemens took the following

five adverse employment actions in retaliation for protected expression: 1) the

implementation of the PIP from October 2005 to February 2006; 2) transferring Hall to

Fain's supervision specifically for the purpose of implementing the PIP; 3) sending Hall

on two business trips to Mexico, once in October 2005 and once in February 2005; 4)

soliciting complaints about Hall from her colleagues on October 21 and November 14,

---

[13] There is also evidence that Hall informally complained about her salary to her supervisors during three different time periods: in mid-February 2005, when she learned that she would only receive the same across-the-board increase as everyone else; in March 2005; and in August 2005, both before and after she received her first promotion and individually-calibrated raise.  In fact, Hall's last formal complaint prior to the filing of her EEOC charge was an email sent on August 29, 2005; in this email, Hall specifically asserted that her salary was unfair and was not comparable to that of her co-workers in the same position.  However, in none of these complaints does Hall contend that the disparity in pay was due to her race or gender, nor does she contend that the disparity in pay was due to any type of discrimination.  Therefore, these earlier complaints do not rise to the level of protected activity.

2005; and 5) transferring Hall to another plant with a difficult supervisor and to a division that was rumored to be closing.  (Doc. 38 at 66–69.)  Because the dates of these actions demonstrate that only one of the business trips to Mexico, as well as Hall's transfer to another plant, occurred after the filing of her EEOC charge, the court limits its evaluation of potential adverse employment actions to these two issues.[14]

### b. Siemens's Adverse Employment Actions

Before evaluating the two qualifying actions, the court addresses an argument by Siemens in its reply brief that purportedly disposes of Hall's entire retaliation claim. Siemens contends that because Hall did file an EEOC charge, she cannot show that *any* of Siemens's alleged actions "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination."  (Doc. 42 at 15–16.)  Since Hall herself was not

---

[14] In particular, then, the court does not discuss whether Hall's PIP, her transfer to Fain's supervision, Walker's emails soliciting complaints, or her first business trip to Mexico in October 2005 were adverse employment actions.  Even if these were found to be causally related to some earlier protected activity, however, the court finds that they still would not constitute adverse employment actions for the following reasons.  The PIP, while an extreme form of employee criticism, had no adverse effects on the conditions of Hall's employment except for delaying her January 2006 raise for one month, which was then retroactively applied after her successful completion of the PIP.  Thus, the PIP had no *materially* adverse effects such that a reasonable employee in Hall's circumstances would have been dissuaded from making or supporting a charge of discrimination.  Second, the transfer to Fain's supervision did not result in any materially adverse effects because it was merely a substitution in the person to whom Hall reported, and, by itself, created no negative changes in the conditions of Hall's employment.  Third, Walker's emails to colleagues, to the extent that Hall even knew about them before initiating this litigation, do not rise to the level of material adversity.  Finally, Hall's first business trip to Mexico is not an adverse employment action because it was at most a minor inconvenience, lasting only a few days.  In addition, the trip was directly related to the products for which Hall was responsible in her job, and Hall herself even seemed to consider the trip a privilege, since she asked her supervisors how her performance could be poor if she was being asked to represent Siemens on this trip.

dissuaded from filing a charge, Siemens posits, she cannot establish material adversity. (*Id.* at 16.)  Siemens, however, fails to recognize that *Burlington* explicitly establishes an objective standard; according to *Burlington*, the pertinent point of view is that of the "reasonable person" in the employee's circumstances, not that of the employee in the particular case.  Consequently, Hall's actual responses are irrelevant to the retaliation inquiry, and instead, the court must consider only whether a reasonable person in Hall's circumstances would have found Siemens's actions materially adverse.

### i. February 2006 Business Trip to Mexico

As with Hall's first trip to Mexico, there is no evidence that this second trip was any more than a trivial inconvenience, again lasting only a few days and relating to the products for which Hall was responsible.  Although in *Burlington Northern*, the Supreme Court acknowledged that certain actions might be materially adverse to some employees, such as a mother with a young child like Hall, but not to others, *see* 126 S. Ct. at 2415, there is no evidence in this case that Hall and her family were so negatively affected by the trip that a reasonable employee in her circumstances would have been deterred from making or supporting a claim of discrimination.  Moreover, to the extent that Hall's final PIP review was delayed for a few days as a result of the trip, the court finds that the trip had no adverse impact on her successful completion of the PIP and that, upon completion, Hall was given a raise retroactively effective to the same date that all other employees received their raises.  Hall's trip to Mexico in February 2006 was therefore not materially

adverse from the perspective of a reasonable person in Hall's position, and thus it is not an adverse employment action within the meaning of Title VII's anti-retaliation provision.

### ii. Hall's Transfer to Plant 1 and to the Supervision of Gericke

The other alleged action that occurred after the filing of Hall's EEOC charge, her transfer to Plant 1 in June 2006 and to the supervision of Gericke, is not an adverse employment action because it is merely a change in Hall's job location and in her reporting structure.  Hall maintains that there were rumors that the division into which she was transferred in Plant 1 was going to close, therefore intimating that she was transferred to force her out of a job, but Hall has no evidence for these rumors except for Carozza's testimony confirming that there was speculation that some divisions might close.  Hall also complains about Gericke having a reputation for being a difficult boss, but Hall offers no evidence to demonstrate that any difficulties she experienced were more than "minor annoyances."  Without any evidence that the transfer to a different plant and different supervisor caused Hall any materially adverse effects in the conditions of her employment, the court finds that these transfers are not adverse employment actions.

### c. Causal Link

Since Hall has not proven the second element of her *prima facie* case, that Siemens took any "adverse employment actions" against her within the meaning of Title VII's retaliation provision, the court does not need to reach the issue of whether there is a

34

causal link between Hall's protected expression and the alleged adverse actions.  In any event, the court notes Hall's second trip to Mexico and her transfer to Plant 1 both occurred at or greater than three months from Hall's EEOC charge, and thus under the Supreme Court's analysis in *Clark County School District v. Breeden*, are too remote in time to establish the necessary causal link.

### 4. Siemens's Legitimate Reasons and Evidence of Pretext

Because the court finds that Hall has not demonstrated that any of Siemens's allegedly adverse employment actions "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," the burden never shifts to Siemens to offer evidence of legitimate, nonretaliatory reasons for its conduct.  Likewise, the court does not elaborate on whether Hall has shown evidence of pretext for any of the reasons Siemens has alleged.  Since Hall did not establish a *prima facie* case, the court is of the opinion that summary judgment is due to be granted on Hall's retaliation claim.

### E. Outrage/IIED Claim[15]

Under Alabama law, Hall can only prevail on a claim of outrage or intentional emotional distress if she establishes that Siemens's conduct was "(1) intentional or reckless; (2) extreme and outrageous; and (3) caused emotional distress so severe that no reasonable person could be expected to endure it."  *See Soti v. Lowe's Home Ctrs., Inc.*,

---

[15] In Alabama, there is no separate cause of action for the tort of intentional infliction of emotional distress; instead, it is encompassed within the tort of outrage.  *See Hardesty v. CPRM Corp.*, 391 F. Supp. 2d 1067, 1073 (M.D. Ala. 2005); *see also Hawkins v. City of Greenville*, 101 F. Supp. 2d 1356, 1363 (M.D. Ala. 2000) (asserting that the two torts are the same).

906 So. 2d 916, 919 (Ala. 2005) (internal quotations omitted).  The Alabama Supreme

Court has acknowledged that the tort of outrage is a "very limited cause of action that is

available only in the most egregious circumstances," *Thomas v. BSE Indus Contractors,*

*Inc.*, 624 So. 2d 1041, 1044 (Ala. 1993), and it has denied summary judgment on this

issue only in three types of cases: 1) those involving wrongful conduct with respect to

family burials; 2) those involving barbaric methods to coerce an insurance settlement; and

3) those involving egregious sexual harassment.  *See Hardesty v. CPRM Corp.*, 391 F.

Supp. 2d 1067, 1073 (M.D. Ala. 2005).  The Alabama Supreme Court has specifically

declined to uphold a claim of outrage even when an employer has allegedly publicly

humiliated its employee.  *See Potts v. Hayes*, 771 So.2d 462, 464–65 (Ala. 2000); *Am.*

*Road Svc. Co. v. Inmon*, 394 So.2d 361, 365–68 (Ala. 1981).

    In support of her outrage claim, Hall argues that Siemens "has gone beyond the

bounds of decency" by: 1) "fabricat[ing] evidence of plaintiff's work performance,"

referring to Walker's emails seeking information about Hall's performance; 2) ignoring

Hall's salary complaints; 3) placing Hall on the PIP; 4) commenting that Hall was pulling

the "race card"; and 5) continuing to discriminate and harass Hall after she notified

Siemens that its treatment of her was adversely affecting her health.  (*See* Doc. 38 at

70–72.)  In her Complaint, Hall also alleged that Siemens had created a hostile work

environment and had failed to promulgate and implement a policy on harassment and discrimination.[16]  (Doc. 1 at 10–11.)

These allegations, even if true, do not support a claim for outrage or intentional infliction of emotional distress under Alabama law.  Siemens's alleged conduct does not fall into any of the categories enumerated by the Alabama Supreme Court, and Hall does not allege facts that show Siemens acted egregiously in internally discussing and evaluating her salary complaints and job performance.  As a result, the court is of the opinion that summary judgment on Hall's claim of outrage and intentional infliction of emotional distress is due to be granted.

**F. Negligent Hiring/Training/Supervision/Retention Claim**

To establish a claim of negligent hiring/training/supervision/retention, Hall must show that an allegedly incompetent employee committed a common-law tort.  *Thrasher v. Ivan Leonard Chevrolet, Inc.*, 195 F. Supp. 2d 1314, 1320 (N.D. Ala. 2002).  Hall must also prove that Siemens, as her employer, knew or should have known about the incompetency of its employees, and that breach of this duty proximately caused the plaintiff's injuries.  *See Norman v. Southern Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1337 (M.D. Ala. 2002).  To the extent that Alabama law recognizes an independent cause of action for employment discrimination, *compare Thrasher*, 195 F. Supp. 2d at 1320 n.3

---

[16] The allegation that Siemens failed to promulgate and implement a policy on harassment and discrimination cannot be reasonably inferred from the evidence because Hall has admitted that Siemens distributed an EEO policy, containing a written policy regarding harassment and discrimination, and that Hall received this policy at her employee orientation.

(noting that Alabama does not recognize a common-law tort for gender-based discrimination in employment) *with Norman*, 191 F. Supp. 2d at 1337 (finding affirmative discrimination and retaliation under the FMLA and ADA as the alleged wrongs underlying a negligent training and supervision claim), Hall must specifically demonstrate that Siemens knew or should have known about its employees' propensity to intentionally discriminate or retaliate against her, as an employee taking advantage of the discrimination statutes. *See id.*

Hall's Complaint pleads only the most basic statement of this claim, alleging that Siemens neglected its duty to provide a non-hostile work environment, failed to discipline or terminate harassing employees, and failed to administer anti-discrimination and anti-harassment employment policies. (Doc. 1 at 11–12.) Hall's opposition brief furnishes no additional facts or analysis, but merely tacks the label of the claim onto her minimal discussion of her outrage claim. (Doc. 38 at 70–72.) As Siemens correctly points out, Hall never specifically identifies any employees who were allegedly incompetent or discriminatory, and for which Siemens ought to be held accountable. Likewise, Hall does not meet her burden of establishing that Siemens knew or should have known about its employees' propensity to discriminate or retaliate, since Hall offers no evidence of Siemens's actual knowledge nor establishes that there were patterns of discrimination that would put Siemens on notice. Furthermore, even if Hall had produced such evidence, she has not shown that Siemens's allegedly negligent hiring, training, supervision, or

retention either actually or proximately caused her injuries.  Because Hall offers no evidence to support this claim, the court is of the opinion that there is no genuine issue of material fact and that summary judgment is due to be granted.

## IV. CONCLUSION

For the foregoing reasons, the court is of the opinion that Siemens's Motion for Summary Judgment, (doc. 27), is due to be granted with respect to Hall's Title VII retaliation claim, her outrage/IIED claim, and her negligent hiring/training/supervision/ retention claim, and is due to be denied with respect to her Title VII, section 1981, and EPA discriminatory pay claims.  An Order granting in part and denying in part Siemens's motion will be entered contemporaneously with this Memorandum Opinion.

**DONE** this13th day of June, 2008.

*Sharon Lovelace Blackburn*
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE