## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHEASTERN DIVISION

| | | |
|---|---|---|
| KENDRA HALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | CASE NO.  5:06-CV-1208-SLB |
| | ) | |
| SIEMENS VDO AUTOMOTIVE, | ) | |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

This case is presently pending before the court on defendant's Motion for Judgment as a Matter of Law, (doc. 103),[1] and plaintiff's Motion for Liquidated Damages, (doc. 110), Motion for Award of Attorneys' Fees and Costs, (doc. 111),  Motion for Bill of Costs, (doc. 116), and Motion for Prejudgment Interest, (doc. 117).  Upon consideration of the record, the submissions of the parties, the arguments of counsel, and the relevant law, the court is of the opinion that defendant's Motion for Judgment as a Matter of Law, (doc. 103), is due to be denied; plaintiff's Motion for Liquidated Damages, (doc. 110), is due to be granted; her Motion for Award of Attorneys' Fees and Costs, (doc. 111), is due to be granted; her Motion for Bill of Costs, (doc. 116), is due to be denied; and her Motion for Prejudgment Interest, (doc. 117), is due to be denied in part and granted in part.

---

[1] Reference to a document number, ["Doc. ___"], refers to the number assigned to each document as it is filed in the court's record.

# I.  MOTION FOR JUDGMENT AS A MATTER OF LAW

## A. RULE 50(a) STANDARD

Rule 50(a) provides:

**(1) *In General*.**  If a party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue, the court may:

> **(A)**  resolve the issue against the party; and
> **(B)**  grant a motion for judgment as a matter of law against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue.

**(2) *Motion*.**  A motion for judgment as a matter of law may be made at any time before the case is submitted to the jury.  The motion must specify the judgment sought and the law and facts that entitle the movant to the judgment.

Fed. R. Civ. P. 50(a).

"[I]n order to survive a defendant's motion for judgment as a matter of law . . . the plaintiff must present evidence that would permit a reasonable jury to find in the plaintiff's favor on each and every element of the claim."  *Nebula Glass Intern., Inc. v. Reichhold, Inc.*, 454 F.3d 1203, 1210 (11th Cir. 2006)(quoting *Bogle v. Orange County Board of County Commissioners*, 162 F.3d 653, 659 (11th Cir. 1998)).  The Eleventh Circuit has held that a Rule 50 Motion for Judgment as a Matter of Law should be denied if "the evidence presents a sufficient disagreement to require submission to a jury," and should be granted if the evidence "is so one-sided that one party must prevail as a matter of law."  *Combs v. Plantation Patterns*, 106 F.3d 1519, 1526 (11th Cir. 1997)(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).  "A judgment as a matter of law may be [granted]

only when the facts and inferences point so overwhelmingly in favor of the movant that reasonable people could not arrive at a contrary verdict. *Richardson v. Leeds Police Dept.*, 71 F.3d 801, 805 (11th Cir. 1995)(internal quotations and citations omitted).  In deciding a Rule 50(a) Motion, the court must consider the evidence in the light most favorable to the non-moving party. *Abel v. Dubberly*, 210 F.3d 1334, 1337 (11th Cir. 2000).

## B.  STATEMENT OF FACTS

Plaintiff began working as an engineer at DaimlerChrysler in 1998, which was the year she graduated from Tuskegee University with a degree in electrical engineering.  (Tr. [12/8/2008] at 239.)  A degree in electrical engineering is the preferred degree for the Quality Planner position.   (Tr. [12/2/2008] at 182; *id*. [12/8/2008] at 239.)  Her starting pay at DaimlerChrysler was $48,360 a year.  (*Id*. at 177.)  In April of 2000 or 2001, plaintiff became a Quality Planner.  (Tr. [12/9/2008] at 180.)  As of April 1, 2004, her salary was $54,080 per year.  (*Id*. at 186-87.)  At this time, she was second or third in seniority in the department. (*Id*. [12/2/2008] at 186.)  In her 2002 job evaluation, Bill Fain, her then-supervisor, rated plaintiff's overall job performance as "excellent."  (*Id*. [12/4/2008] at 514, 515-16.)

Defendant took over the Huntsville DaimlerChrysler facility in April 2004.  (Tr. [12/9/2008] at 189.)   As part of the purchase agreement, it agreed to maintain the salaries of all former DaimlerChrysler employees until March 2005.  (Tr. [12/8/2008] at 171.)

Defendant hired plaintiff after she returned from maternity and disability leave in August 2004.  (*See* Pl. Ex. 1; Tr. [12/9/2008] at 191.)  Plaintiff testified she did not think defendant had discriminated against her by paying her the same amount she had been paid by DaimlerChrysler.  (Tr. [12/9/2008] at 193.)

In early 2005, plaintiff learned that defendant was going to give everyone, including herself, a 3% across-the-board pay increase, which would raise her salary to $55,896 per year.  (Tr. [12/9/2008] at 196; Pl. Ex. 5.)  Pete Carozza, Director of Human Resources, testified that everyone received the same increase because "there was so much work that had occurred during the first year . . . we were changing manufacturing processes.  We were converting systems over.  And, in fact, [defendant] viewed that as the fairest way to approach it."  (Tr. [12/8/2008] at 77, 172.)  At this time, plaintiff was the lowest paid Quality Planner.  (Tr. [12/4/2008] at 629.)

In February 2005, plaintiff complained to Pete Walker, Director of Quality, that her salary and grade level were the lowest in the Planning Department despite her seniority.  (Pl. Ex. 6; Tr. [12/2/2008] at 176.)  Walker confirmed that plaintiff was "on the bottom side of the salary range."  (Pl. Ex. 7.)  He sent a request for a pay and grade level adjustment to

Carozza, which stated that plaintiff had "performed to the scale equal to that of her counterparts within this same job function."  (Pl. Ex. 7 at 0031; Tr. [12/2/2008] at 203.) Walker testified that plaintiff had performed the same job as the other Quality Planners and that she had the same skills, responsibilities, and job duties as the other Quality Planners. (Tr. [12/2/2008] at 202-03.)

Walker told plaintiff she would have to "be as patient as possible," and wait until the following year for an additional pay increase.  (*Id.* at 205 and Pl. Ex. 8 at 0029.)  Plaintiff complained that making her work another year at a grade level below her coworkers was unfair.  (Tr. [12/2/2008] at 205-06 and Pl. Ex. 8 at 0027-0028.)  However, Walker told her that she needed to "move forward."  (*Id.* at 208.)  He testified, "If [defendant] was not going to allow us to give her a raise, then we needed to work hard on our goals and objectives, so that when next year came around, she would get the raise that was due to her based on her performance."  (*Id.*)  He also told plaintiff that her situation did not warrant an appeal because the wage appeal process was only "for employees that were over the salary range." (*Id.* at 210.)  Walker told plaintiff, "I'm sorry that [DaimlerChrysler] screwed you over. . . . I understand your position, concern and feelings however as part of the LEADERSHIP I

5

HAVE ACTED IN YOUR BEST INTEREST.  Now help me and yourself by following the

needed steps so that there [are] no other excuses from [Human Resources].  (Pl. Ex. 9 at 0018

[emphasis in original].)

As of April 1, 2005, plaintiff was classified as a grade 8 and was paid $55,896 a year.

(Pl. Ex. 5.)  The minimum salary for a grade 8 employee was $52,584, and the midpoint

salary was $65,736.  (*Id*.)  Every other Quality Planner was a grade 9.  (Tr. [12/2/2008] at

206.)  The minimum salary for a grade 9 employee was $59,304, and the midpoint salary was

$74,124.  (*See* Pl. Ex. 21.)

Defendant was short-staffed in 2004-2005 with regard to engineers in the Planning

Department.  (Tr. [12/2/2008] at 186.)  During this time frame, defendant hired two male

Quality Planners, Robert Hagood and John Paynter.  (Pl. Ex. 47 at 100376; Pl. Ex. 48 at

100266.)  Both Hagood and Paynter were hired as a grade 9 with a starting salary of $74,124,

the midpoint salary for a grade 9, which was over $18,000 more than plaintiff's salary as of

April 1, 2005.  (Tr. [12/2/2008] at 206; Pl. Ex. 47 at 100376; Pl. Ex. 48 at 100266.)  Walker

testified that he could not recall any reason Hagood and Paynter would be paid more than

plaintiff for performing the same job.  (Tr. [12/2/2008] at 225.)

6

Robert Hagood graduated from the University of Alabama at Huntsville in 1990 with a degree in Mechanical Engineering.  (Tr. [12/2/2008] at 335-36.)  Thereafter, he worked for Nissan Global Manufacturing, an automobile manufacturing plant, and he testified quality assurance was a "large component" of his job.  (Tr. [12/2/2008] at 337.)  Also, he worked for Ad Tran as a Purchasing Engineer and for GE Gas Turbines and Duracell as an engineer.  (Pl. Ex. 47 at 100388.)  He is a Certified Quality Engineer.  (Tr. [12/2/2008] at 241.)  To obtain this certification, he needed "a combination of experience in quality engineering and/or a degree in engineering.  (Tr. [12/2/2008] at 338.)  He also had to pass a five-hour exam with 180 problems.  (Tr. [12/2/2008] at 338.)

Greg Jacks, a Quality Engineer and Manager, interviewed Hagood and testified that he thought Hagood "probably had the best interview of anyone [he] had ever interviewed at that time."  (Tr. [12/5/2008] at 951; Tr. [12/8/2008] at 34.)  Jacks testified, "His eye contact and professionalism just bubbled out more so than anyone else," and Jacks "basically ran back to Pete Walker and said we got to hire this guy."  (Tr. [12/8/2008] at 34.)

Hagood was unemployed at the time defendant hired him; his previous salary had been only $66,000 a year.  (Tr. [12/2/2008] at 310, 316 and Pl. Ex. 47 at 100388.)  Kevin

Kuykendall, Human Resources Specialist, testified that he set Hagood's salary at the grade 9 midpoint because of "a combination of his experience, his education[, and he] had a . . . quality certification." (Tr. [12/4/2008] at 618.) He set Hagood's salary over $8,000 higher than his previous salary because "regardless . . . if he's unemployed, he had the skills needed for the position. So just because someone is unemployed, it's almost as if you imply we should try to pay them less. And for me, that in and of itself is unfair." (Tr. [12/4/2008] at 591, 624.)

Walker testified that defendant "didn't have negotiations" with job applicants regarding salaries. (Tr. [12/2/2008] at 227-28.) Hagood testified that he did not negotiate his salary and that he had accepted the salary offered by defendant. (*Id*. at 316, 322.)

John Paynter graduated from high school in 1986 and joined the Air Force. (Tr. [12/2/2008] at 380.) He remained in the Air Force almost four years, and, during that time, he "worked on B1 bombers with the offensive and defensive radar, all onboard electronics, flight controls, flight instruments. Technician electronic work [he] did best." (Tr. [12/2/2008] at 380-81.) While he was in the Air Force, Paynter earned a journeyman

avionics[2] certification and also obtained 72 credit hours towards his "electrical engineering technology degree." (Tr. [12/2/2008] at 381-82.) Paynter has a degree in "interdisciplinary sciences with an emphasis on technology management" from the South Dakota School of Mines and Technology, which Paynter testified was "world renowned for geological engineering [and] mining engineers." (Tr. [12/2/2008] at 348-49.) Paynter testified that his degree in Interdisciplinary Sciences was "like a general engineering degree" and that he had concentrated in "the actual management of technology, of increasing technologies in today's environment." (Tr. [12/2/2008] at 348.) Prior to going to work for defendant, Paynter had worked for Target Corporation as Facility Manager at the Target Distribution Center in Huntsville, Alabama. (Tr. [12/2/2008] at 354.) He testified that he "was responsible for making sure that the equipment in the building was maintained." (*Id.*)

Defendant hired Paynter in July 2004, as a Production Supervisor, earning $65,004 per year. (Pl. Ex. 48 at 100282.) As a production supervisor, Paynter testified, he was "heavily involved in quality, setting up error proofing, going through the control plans, working with our ISO auditors and T&B auditors. . . . [Y]ou were always in that mix of,

_____

[2]According to Paynter, "avionics" is "pretty much all of [an airplanes's] flight controls." (Tr. [12/2/2008] at 381.)

when you had a problem out on the floor, you were . . . the supervisor and the employees working for you, your team, you're the first line of defense out there.  So  you're always involved right in the midst of the quality as it's happening."  (Tr. [12/2/2008] at 388-89.) However, he did not have any actual experience working as an engineer or in a quality position until he was actually placed in the Quality Planner position with defendant.  (Tr. [12/2/2008] at 389-90.)

While working as a Production Supervisor, Paynter received hourly pay for any hours worked over 45 per week.  (Tr. [12/2/2008] at 384-85.)  He estimated that, in 2005, he was on target to earn between $80,000 and $85,000 per year.  (Tr. [12/2/2008] at 384-85.)

Paynter applied in December 2004 or January 2005, for a Quality Planner position for the production line on which he was working as a Production Supervisor.  (Tr. [12/2/2008] at 357, 387.)  Defendant promoted Paynter to Quality Planner, starting at the midpoint salary, $74,124, for a grade 9 employee.  (Tr. [12/2/2008] at 373-74; Pl. Ex. 51 at 101125.)  Paynter testified that he believed his starting salary as a Quality Planner was "pretty much whatever their standard was for the [Quality Planner] position."  (Tr. [12/2/2008] at 358.)  When asked why he set Paynter's salary at the same grade 9 midpoint salary he set for Hagood,

10

Kuykendall testified that "different factors" went into setting Hagood's and Paynter's salaries, although he could not recall those "factors" at trial.  (Tr. [12/4/2008] at 631-32.) However, he testified that he considered Paynter's ability to earn overtime pay in setting his starting salary as a Quality Planner.  (*Id*. at 632-33.)

In June 2005, plaintiff met with Kuykendall to inquire about applying for other positions with defendant.  (Tr. [12/9/2008] at 56, 58.)  At this time, plaintiff complained to Kuykendall that she was the lowest paid Quality Planner and that she was working at a lower grade than other Quality Planners.  (*Id*. at 58.)  According to plaintiff, Kuykendall brushed her off and said that he knew nothing about that.  (*Id*. at 58-59.)  Contrary to plaintiff's testimony, Kuykendall testified that he first became aware of plaintiff's "compensation issues" in August 2005.  (Tr. [12/4/2008] at 626.)  He testified that he had investigated these issues "immediately" because he "take[s] those complaints very seriously."  (*Id*. at 627.)

In July 2005, Gayle Burch applied for a Quality Planner position with defendant.  (Tr. [12/2/2008] at 401.)  Burch had graduated in 1988 from the University of South Alabama with a degree in Chemical Engineering.  (Tr. [12/2/2008] at 396.)  Approximately six months after graduating from college, she began her professional career as an engineer, and she has

11

always worked as an engineer.  (Tr. [12/2/2008] at 420.)  She began working at GE and worked there five to six years.  (Tr. [12/2/2008] at 421.)  Thereafter, she worked a series of jobs in the automotive industry and in quality roles for 14-15 years. (Tr. [12/2/2008] at 422.) She is a Certified Quality Auditor with the American Society for Quality.  (*Id*. at 396.)  To obtain this certification, she had training and a four-hour exam for which she studied extensively.  (*Id*. at 397.) The exam focused on all quality systems. (*Id*.)

At the time she applied with defendant, Burch's then-employer paid her a salary of about $72,000, plus overtime; her total compensation for 2005 was on target to be approximately $80,000.  (Tr. [12/2/2008] at 400.)  She also had an offer to stay with her employer as a regular full-time employee earning $76,000 per year.  (Tr. [12/2/2008] at 425-26.)  Defendant initially offered Burch $66,000 a year, which she rejected.  (Tr. [12/2/2008] at 401.)  Defendant then offered her $72,060 as year, which she accepted.  (Tr. [12/2/2008] at 401.)  She specified on her job application that her "Salary Desired" was $72,000.  (Pl. Ex. 49 at 100805.)  As of trial, defendant paid Burch $78,284 per year.  (Tr. [12/2/2008] at 428.)  She testified that she "guess[ed], based on what [she knew]" that she was paid fairly.  (Tr. [12/2/2008] at 428.)

Kuykendall testified that he established the salary of Gayle Burch at $72,060, even though she would have earned about $80,000 with overtime in her previous job and she had asked defendant for $80,000.  (Tr. [12/2/2008] at 401; Tr. [12/4/2008] at 637.)  He testified that he had "tried to get her cheaper."[3]  (Tr. [12/4/2008] at 638.)  He could not explain why Burch was paid over $2,000 a year less than Paynter, who did not have an engineering degree, quality experience, or quality certification.  (Tr. [12/4/2008] at 640.)

The day after defendant hired Burch, on August 2, 2005, plaintiff gave a letter to Jessie Patterson,[4] her Supervisor at the time, and Bill Fain, another Quality Planner Supervisor, complaining about her pay.  (Tr. [12/9/2008] at 60, 62; Pl. Ex. 15.)  In this letter, plaintiff wrote:

> It is my understanding there will be a new hire that will join the Quality Planner Division as a Grade 9.  Currently my grade is an 8 and my salary is at the very bottom of the Grade 8 pay scale.  I believe that I am just as qualified as or even more qualified.  I am requesting that my pay either match of exceed the new hire's salary,

---

[3]He also testified that trying to get Hagood cheaper because he was unemployed would have been "unfair."  (Tr. [12/4/2008] at 624.)

[4]Jessie Patterson had a bachelor's degree in electrical engineering and a master's of science in management with a concentration in information systems.  (Tr. [12/5/2008] at 824.)  Patterson was promoted to supervisor in July 2005.  (*Id*. at 826.)  The jury was not informed that, as of April 1, 2005, Patterson made $64,644 per year; which was almost $10,000 a year less than the starting salaries paid to Hagood and Paynter.  (*Id*. at 847-48; Pl. Ex. 47 at 100376, Pl. Ex. 48 at 100266; Pl. Ex. 51.)

immediately.  If this [cannot] be done please respond as to what may prevent this from occurring.  Thank you for your cooperation and support.

(Pl. Ex. 15.)  Patterson gave the letter to Walker and told him that plaintiff had an attorney.

(Tr. [12/5/2008] at 833; Tr. [12/9/2008] at 66.)

On August 5, 2005, Walker sent Kuykendall an email, which stated:

Kevin, I appreciate your assistance in the matter involving Mrs. Washington-Hall.  Your research and recommendations have been reviewed by my staff and I feel your recommendations are appropriate.  ***Bring Kendra up to the bottom or base as you stated and then we will launch the PIP[5] process.  In addition, Mr. Bill Fain and Mr. Greg Jacks are assembling documentation and records of the performance related [deficiencies]***.  When can we get this process started and give Kendra her increase?  I [am] looking forward to hearing from you.  Thanks for your cooperation and insight in this matter.

(Pl. Ex. 17 [footnote and emphasis added].)

On August 17, plaintiff sent Walker an email, inquiring about "a number of questions" regarding her pay that Walker had never answered.  (Pl. Ex. 20.)  Walker responded:

[I] have forwarded your concerns to Human Resources.  Your particular situation is in for review.  You should hear something by next week.  I have personally gone forward with this activity.  Keep in mind your pay is based on your performance to goals and objectives established between you and your supervisor and not those of others.

(*Id*.)  Walker did not mention the PIP or any performance problems.  That evening, Walker sent the following email to Kuykendall:

---

[5]"PIP" stands for "performance improvement plan or process."  (Tr. [12/2/2008] at 235-36.)

I would like to move forward on this as soon as we can.  The conversation of bringing her closer to the lower end is the immediate direction.  The PIP process should follow.  ***Although documented evidence in most of this is [non-existent,] the truth will shortly come out when she fails to perform under this process***.  I don't remember the exact amount you told me but some portion of this needs to take place.

(*Id.* [emphasis added].)

Defendant gave plaintiff a grade increase and a raise on August 22, 2005, retroactive to July 1, 2005.  (Pl. Ex. 21.)  It raised her salary from $55,896 to $61,368, (Pl. Exs. 5, 21), which was $2,064 above the minimum salary for a Grade 9 Quality Planner and $12,756 less than the starting pay of Hagood and Paynter.  (*Id.*; Tr. [12/4/2008] at 628.)  Plaintiff told Fain and Kuykendall "that [she] was grateful for the increase but [she] was disappointed in the amount."  (Tr. [12/9/2008] at 78.)  With the raise, plaintiff remained the lowest paid Quality Planner.  (*See id.* at 81 and Pl. Ex. 22.)

Kuykendall testified that he told plaintiff, "based on compensation policy, [defendant was] able to give between six and ten percent, and [he] was giving her almost the full amount that [he] could give."  (Tr. [12/4/2008] at 637.)  He expected plaintiff to be "satisfied"; and he was surprised she wanted more money.  (Tr. [12/4/2008] at 635.)  He also testified that "different factors" went into establishing Hagood's and Paynter's much higher  and exactly

the same starting salaries.  (Tr. [12/4/2008] at 632.)  However, at trial he could not say what

those factors actually were.  (*Id*.)

Plaintiff asked Kuykendall what factors defendant had considered in determining the

amount of her raise, and he referred her to a policy limiting in-classification raises to 6-10%.

(Tr. [12/4/2008] at 682; Tr. [12/9/2008] at 78, 80-81.)  The written policy admitted at trial

had an effective date of January 1, 2006.  (Pl. Ex. 53.)  It states, "Internal promotion salary

increases can range from 0% to 10% within the same classification . . . ."  (*Id*. at 101299.)

Plaintiff again asked Kuykendall for the specific factors that he had considered in setting the

amount of her raise, and, Kuykendall sent plaintiff an email, in which he told her that he was

not ignoring her questions about her raise but that he did not "want to give [her] a half

thought out answer."  (Pl. Ex. 23 at 0024.)  At trial, Kuykendall testified that he had already

told plaintiff that her raise was limited by the "policy" and he did not want to tell her that

again because it might come across as "rude."  (Tr. [12/4/2008] at 682-83.)  He never told

plaintiff any objective or subjective basis for the amount of her raise, except to say that the

"policy" limited her raise to no more than 10%, and "I'm giving you the 9.789 percent."  (Tr.

[12/4/2008] at 655-56; Tr. [12/9/2008] at 80-81.) No one mentioned the PIP or plaintiff's

16

alleged performance issues as a factor in the determination of the amount of plaintiff's raise, even though plaintiff directly asked if defendant had any issues with her performance. (Tr.[12/9/2008] at 79; Pl. Exs. 17, 20.)

Carozza approved Kuykendall's recommendation to give plaintiff a raise. He testified that he told Kuykendall that defendant would eliminate the remaining disparity between plaintiff's pay and the pay of the other Quality Planners with "salary planning" over time. (Tr. [12/4/2008] at 648-49.) Carozza and Kuykendall testified that they did not eliminate the entire gap between plaintiff's pay and the pay of her comparators with a single increase because the gap had been caused by DaimlerChrysler and because defendant's policy did not permit such a large increase at one time. (Tr. [12/4/2008] at 655; Tr. [12/8/2008] at 173.) However, neither Carozza nor Kuykendall told plaintiff of their plan to equalize her salary over time. (Tr. [12/4/2008] at 591, 651.)

On October 17, 2005, Fain became plaintiff's supervisor. (Tr. [12/4/2008] at 537; Pl. Ex. 26.) On this day, Fain sent an email to Kuykendall, which stated, "My time has come. I must get the PIP in place." (*Id.*) Less than a week later, defendant placed plaintiff on a 75-day PIP, which Kuykendall had prepared. (Pl. Ex. 29 at 1097; Tr. [12/4/2008] at 542-43.)

Defendant did not apprise plaintiff of any complaints about her work performance until October 17, 2005.  (Tr. [12/5/2008] at 697; Tr. [12/4/2008] at 650; Tr.. [12/2/2008] at 235-36.)

In October or November of 2005, defendant hired Jeff Hall as a grade 9 Quality Planner.  (Tr. [12/4/2008] at 461-62; Pl. Ex. 50 at 9788.)  Defendant had hired Hall[6] in February 2005, as a Quality Engineer, a position below Quality Planner.  (*See* Pl. Ex. 48 at 100837.)  He did not negotiate his salary, which was set at $70,008, $9,000 more than defendant paid plaintiff.  (*Id*. at 464-65, 659; Pl. Ex. 50 at 9788.)

Hall has a B.S. degree in Applied Sciences from the U.S. Naval Academy and a MBA from the University of Central Florida.  (Pl. Ex. 50 at 100843.)   He had taken only two electrical engineering classes.  (Tr. [12/4/2008] at 457.)  During his time in the Navy, Hall did "quite a bit" of electronic work that "involved control panels of aircraft."  (Tr. [12/4/2008] at 456.)  Hall was a Sales Manager for Federal Signal Corporation for five years. (Tr. [12/4/2008] at 452.)  While at Federal Signal, part of his training "was spending time out on the lines learning how they make the light bars and so forth."  (Tr. [12/4/2008] at 452.)

---

[6]The court will refer to Jeff Hall as "Hall" and Kendra Hall as "plaintiff".

18

He also worked at Aerodyne, as Director of Business Sales for one year, where he "served primarily [in] a recruiting role." (Tr. [12/4/2008] at 452-53.)  He then worked in sales for BECO Holding Co. for less than two years. (Pl. Ex. 50 at 100843.)  He testified, "As a sales consultant primarily, you're called several times to trouble shoot what's wrong with a siren or . . . the lights that go in the police vehicles.  If there's a problem, you fix it." (Tr. [12/4/2008] at 451.)  Prior to working for defendant, he had no experience in electrical analysis. (*Id*. at 452.)

Hall initially applied for a position as a Quality Engineer after hearing about the opening from a friend. (Tr. [12/4/2008] at 448-50.)  Hall received an offer for $26 per hour or $54,080 per year, and he started work on March 14, 2005. (Tr. [12/4/2008] at 459, 657.)  His initial salary was set by defendant's collective bargaining agreement. (Tr. [12/4/2008] at 657.)  In this position, Hall received overtime. (Tr. [12/4/2008] at 495.)

Hall applied for a Quality Planner position, and, after an interview, Hall received an offer letter offering him $70,008 per year. (Tr. [12/4/2008] at 463, 465.)  Hagood testified that his actual pay did not change much with the promotion. (Tr. [12/4/2008] at 496 ["It was pretty much a wash."].)  He did not negotiate his salary. (Tr. [12/4/2008] at 464-65.)

Kuykendall said that Hall's salary was set higher than plaintiff's salary because he lost the opportunity to earn overtime pay by moving to the Quality Planner position.  (Tr. [12/4/2008] at 658-60.)  He also testified that Hall was on track to make $91,000 that year, which was $10,000 more than Paynter would have made as a production supervisor. However, even though Kuykendall testified that he considered Hall's overtime in setting his salary, he set his starting salary at $4,000 less than Paynter's starting salary.

Effective January 1, 2006, defendant increased plaintiff's salary to $67,326.83 per year.  (Pl. Ex. 43.)  This increase was comprised of a 3.5% merit increase and a 6% equity increase.  (Tr. [12/9/2008] at 240-41; Pl. Ex. 44.)  Carozza told plaintiff that the equity increase was designed to "eliminate the gap caused by Chrysler."  (Tr. [12/9/2008] at 240.)

Effective February 1, 2007, defendant increased plaintiff's salary to $73,502.40, which consisted of a 6% equity increase and a 2.99% merit increase.  (Pl. Ex. 39 at 1309; Pl. Ex. 80.) Carozza met with plaintiff and explained to her the pay increases in person and by email.  (Tr. [12/9/2008] at 241; Pl. Ex. 39 at 1310.)

In 2008, defendant increased plaintiff's pay to $78,647, which was a 3.5% merit increase and a 3.3% equity increase.  (Tr. [12/8/2008] at 189; Pl. Ex. 80.)

20

**C. DISCUSSION**

**1.  Title VII and Section 1981 – Race Discrimination in Compensation and Retaliation**

Because the jury found in favor of defendant as to plaintiff's race discrimination claims, (*see* doc. 108 ¶ 1(a)), the court pretermits discussion of whether plaintiff presented sufficient evidence to reach the jury on these claims.

**2.  Title VII – Sex Discrimination in Compensation**

Title VII makes it an unlawful employment practice for an employer to "discriminate against any individual with respect to [her] compensation . . . because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Plaintiff offered only circumstantial evidence of discrimination; therefore, the court will use the burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), and *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248 (1981).  Under this framework, plaintiff must first prove a *prima facie* case, creating a presumption of discrimination, by showing that she was a qualified member of a protected class and was subjected to an adverse employment action in contrast with similarly situated employees outside the protected class.  *See McDonnell Douglas*, 411 U.S. at 802; *see also Vessels v. Atlanta Indep. Sch. Sys.*, 408 F.3d 763, 767–68 (11th Cir. 2005).  Once plaintiff has proven a *prima facie* case, the burden shifts to defendant to offer a legitimate, nondiscriminatory reason for its employment actions.  *See Burdine*, 450 U.S. 248, 253 (1981).  If defendant accomplishes this, the burden shifts back to the plaintiff to prove by a

preponderance of the evidence that the defendant's alleged reason or reasons were a pretext for unlawful discrimination. *See id.* However, "[w]hen the trier of fact has before it all the evidence needed to decide the ultimate issue of whether the defendant intentionally discriminated against the plaintiff, the question of whether the plaintiff properly made out a prima facie case 'is no longer relevant.'" *Richardson*, 71 F.3d at 806 (quoting *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 715 (1983); citing *Wall v. Trust Co. of Georgia*, 946 F.2d 805, 809-10 (11th Cir. 1991)). Therefore, the issue before the court is whether "the facts and inferences point so overwhelmingly in favor of [defendant] that reasonable people could not [find that its articulated reasons for paying plaintiff less than her male coworkers are unworthy of credence]." *Id.* at 805.

Plaintiff provided ample evidence at trial that she repeatedly asked for pay raises from her supervisors, and that she remained the lowest-paid Quality Planner, despite her qualifications and experience. She received a salary that was significantly less than similarly situated male co-workers – Hagood, Paynter, and Hall. Defendant asserted that it based plaintiff's starting salary on the salary she received while working for DaimlerChrysler and that it gave her raises limited by its policy until her pay was adjusted to an equitable level. Also, it contends that it started male Quality Planners at a substantially higher salary based on non-discriminatory factors, including negotiations, prior salaries, compensation for lost overtime pay, education, skills, and certifications.

In this Circuit,

A plaintiff raises a genuine issue of material fact concerning pretext if [she] casts sufficient doubt on the defendant's proffered [non-discriminatory] reasons to permit a reasonable fact finder to conclude that the employer's proffered reasons were not what actually motivated its conduct but were pretext for [discrimination].   A plaintiff may show pretext either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.   A plaintiff withstands summary adjudication by producing sufficient evidence to allow a reasonable finder of fact to conclude that the defendant's articulated reasons for its decision are not believable.

*Corbitt v. Home Depot U.S.A., Inc.*, 573 F.3d 1223, 1248 (11th Cir. 2009)(internal quotations and citations omitted).

### a.  DaimlerChrysler salary

Defendant contends that it "based Plaintiff's salary on the salary she received from Chrysler at the time of the acquisition," and that "[i]t was entirely lawful for [defendant] initially to pay the legacy Chrysler workforce the same salaries they received under Chrysler." (Doc. 103 at 16.)  If this case was based only on a comparison of salaries of the Quality Planners on the day defendant took over, this argument would be sufficient to entitle defendant to judgment as a matter of law.   However, this case is ***not*** based solely on the salaries inherited by defendant.   The year after its acquisition of the Huntsville facility, defendant set the salaries of two new male Quality Planners at $74,124 a year, over $18,000 more than it paid plaintiff.   Also, when defendant discovered that plaintiff was in the wrong classification, it raised her only to the minimum salary for a grade 9 employee and it placed her on a PIP with the expectation, expressed in writing, that she would fail, (*see* Pl. Ex. 20 ["the truth will . . . come out ***when*** she fails to perform"]).

23

Defendant cannot blame DaimlerChrysler for the disparity in pay between its male and female Quality Planners because defendant, not DaimlerChrysler, established the starting salary of the comparators. It contends that it could not raise plaintiff's salary to a level equal to male Quality Planners because of its policy that limited in-classification raises to less than 10%. The court notes that the jury could have rejected this alleged limitation on raises because the alleged policy was not published until well after defendant made the salary decisions in this case. Moreover, this policy is not mentioned in any of the emails between Pete Walker, Pete Carozza, and Kevin Kuykendall, and defendant never told plaintiff that it planned to eliminate the disparity in pay over time.

Nevertheless, federal law provides that "an unlawful employment practice occurs, with respect to discrimination in compensation . . . when an individual is affected by application of a discriminatory compensation decision or other practice, including *each time wages, benefits, or other compensation is paid*, resulting in whole or in part from such a decision or other practice." 42 U.S.C. § 2000e-5(e)(3)(A). Defendant argues that its policy limited the amount it could increase plaintiff's salary each year. Each paycheck plaintiff received up to the time defendant completed equalizing her salary would constitute an act of discrimination. Because the jury found defendant was responsible for the disparity between plaintiff's salary and her male comparators, defendant is not relieved of liability for plaintiff's unequal pay until the disparity disappears.

24

Therefore, every paycheck that delivered less to plaintiff than to her male co-workers was discriminatory.

### b. Burch

Defendant contends:

> Plaintiff's claims of intentional gender discrimination are substantially undermined by the fact that Gayle Burch is female, a fact which raises an inference that defendant was motivated by factors other than gender in setting the starting salaries of the comparators. Indeed, Ms. Burch was paid more than Mr. Hall, one of plaintiff's male comparators.

(Doc. 103 at 15.)  However, the fact that Burch was paid more than one of the three male comparators does not, as a matter of law, compel a finding of no gender discrimination. Indeed, defendant's actions regarding the setting of Burch's starting salary are inconsistent with its actions regarding the setting of the starting salaries of Hagood and Paynter.  For example, at the time she applied with defendant, Burch had an engineering degree and 14-15 years of experience in quality positions in the automotive industry, was employed at a salary of $72,000 per year plus overtime, was on track to make $80,000, and had an offer from her then-employer for $76,000.  She asked defendant for $80,000 a year to start and defendant's opening offer to her was $66,000 – $6,000 less than she indicated was her minimum acceptable salary and $8,000 less than the starting salary of Hagood and Paynter. Nevertheless, when Burch rejected the $66,000 offer, defendant offered her only $72,060, the salary she was making with her then employer and the minimum salary on her application, which was $2,000 less than it had offered Hagood and Paynter.  Burch had more

25

years of experience than the other applicants, she had more specialized experience in quality in the automotive industry than any other applicant, and she was a Certified Quality Auditor with the American Society for Quality.  And yet defendant's initial offer to her was only $66,000, and its final offer was only $72,060.

Comparatively, Hagood, whose first offer was $74,000, more than $18,000 per year than defendant paid plaintiff, had earned only $66,000 a year in his last position and was unemployed at the time of his interview.  Nothing in the record indicates that Hagood had other job offers; so, there was no market demand for his services.  Yet, defendant offered him $2,000 more than it offered Burch and over $18,000 more than it paid plaintiff.  Kuykendall testified that it would have been "unfair" to try to pay him less, but it was not "unfair" to try to pay Burch less.

Around the same time it hired Hagood, defendant hired Paynter as a Quality Planner. When Paynter first started working for defendant, he was working at Target and making $65,000 a year.  Defendant hired him as a Production Supervisor making almost $67,000 per year, a $1,000 more than its first offer to Burch and $12,000 more than it paid plaintiff. Paynter did not have an engineering degree.  Moreover, prior to working for defendant he had no experience in quality or in the automotive industry.  As a Production Supervisor, Paynter earned overtime and, at trial, defendant relied on his ability to earn overtime as one reason it offered him over $74,124 to be a Quality Planner.  However, Burch also had the

ability to earn overtime in her prior position; yet, defendant's first offer to her was only $66,000 and her actual starting salary was $72,060.

Based on this evidence, the jury could find that defendant's non-discriminatory reasons for paying the male Quality Planners more than plaintiff are unworthy of credence. The court finds that the evidence is not so one-sided as to compel a decision in favor of defendant. Therefore, defendant's Motion for Judgment as a Matter of Law, (doc. 103), will be denied as to plaintiff's Title VII gender discrimination claim.

### 3. Equal Pay Act

The Equal Pay Act ["EPA"] prohibits gender discrimination under a different standard than Title VII.

> Congress' purpose in enacting the Equal Pay Act was to remedy what was perceived to be a serious and endemic problem of employment discrimination in private industry – the fact that the wage structure of 'many segments of American industry has been based on an ancient but outmoded belief that a man, because of his role in society, should be paid more than a woman even though his duties are the same.' S. Rep. No. 176, 88th Cong., 1st Sess., 1 (1963). The solution adopted was quite simple in principle: to require that 'equal work will be rewarded by equal wages.' Ibid.

*Corning Glass Works v. Brennan*, 417 U.S. 188, 195 (1974). A plaintiff suing under the EPA must make a prima facie case by showing that her employer paid her less than a male co-worker "for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions." 29 U.S.C. § 206(d)(1); *see Corning Glass Works v. Brennan*, 417 U.S. 188, 191 (1974); *Irby v. Bittick*, 44 F.3d 949, 954 (11th Cir. 1995). Plaintiff does not have to show that the jobs held by the

comparators are identical to hers, just that they are "substantially equal." *See Miranda v. B&B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1533 (11th Cir. 1992). The EPA compares the jobs and not the employees, so the skills and qualifications actually needed to perform the job, and not the skills and qualifications of the employees themselves, are considered when determining whether the work is equal. *See id.* Job titles are "entitled to some weight in this evaluation," but "'the controlling factor is job content' — the actual duties that the respective employees are called upon to perform." *See id.* (quoting *Hodgson v. Behrens Drug Co.*, 475 F.2d 1041, 1049 (5th Cir.), *cert. denied*, 414 U.S. 822 (1973)).[7] At trial, the court found that plaintiff was entitled to Judgment as a Matter of Law as to her EPA prima facie case. Therefore, the burden shifted to defendant to prove, by a preponderance of the evidence that the differential between plaintiff's pay and her male comparators was the result of: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than sex. 29 U.S.C. § 206(d); *see also Irby*, 44 F.3d at 954.

Defendant argued that plaintiff's salary was originally set in the same manner as all other former DaimlerChrysler employees, by matching the salary that the employees had been paid by DaimlerChrysler. Therefore, defendant asserts that its pay-setting decisions at the time it acquired the DaimlerChrysler plant were based on prior pay and not on considerations

---

[7]Decisions of the former Fifth Circuit Court of Appeals rendered prior to October 1, 1981, constitute binding precedent in the Eleventh Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

of gender.   However, the evidence shows that defendant only maintained the old DaimlerChrysler salaries for a year after acquisition and that all of the comparators were hired by defendant so their salaries were not determined by any conduct of DaimlerChrysler.

Defendant contends, "[T]he evidence established that [defendant] based the salaries of [plaintiff's] comparators – Jeff Hall, Robert Hagood, Robert Paynter, and Gayle Burch – on skills, experience, professional certification, individual negotiation, and market demand, all legitimate, nondiscriminatory reasons unrelated to sex."  (Doc. 119 at 23.)  Defendant does not elaborate on these factors in its argument in support of its Motion for Judgment as a Matter of Law, (*see id*.), but the court notes that, when comparing all Quality Planners on these factors, defendant did not consistently apply these factors when it established the salaries.   *See Combs*, 106 F.3d at 1538 (evidence of "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action" will support a jury's finding that the reasons were unworthy of credence)(citations omitted).

The basic problem with defendant's argument that it is entitled to judgment as a matter of law on plaintiff's EPA claims is that it paid two male Quality Planners, Hagood and Paynter, the exact same starting salary, which was over $18,000 more than it paid plaintiff, despite very different "skills, experience, professional certification, individual negotiation, and market demand."  It also paid these two male Quality Planners a starting salary that was $2,000 more than it paid Burch, who had demonstrated "skills, experience and professional

certification," and who also had a demonstrated "market demand" for her services.  None of these Quality Planners negotiated their starting salary.  This evidence is sufficient to allow the jury to disbelieve defendant's evidence regarding how it set salaries and allow it to find that differences between plaintiff's salary and that of male Quality Planners were not based on defendant's articulated factors other than sex.

The court finds sufficient evidence exists to support the jury's verdict in favor of plaintiff on her Title VII and Equal Pay Act claims.  Therefore, defendant's Motion for Judgment as a Matter of Law, (doc. 103), will be denied.

## II. <u>MOTION FOR LIQUIDATED DAMAGES</u>

"When the jury finds an employer has violated the FLSA and assesses compensatory damages, the district court generally ***must*** add an award of liquidated damages in an equal amount." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1282 (11th Cir. 2008)(citing 29 U.S.C. § 216(b) and *Alvarez Perez v. Sanford-Orlando Kennel Club, Inc.*, 515 F.3d 1150, 1163 (11th Cir. 2008))(emphasis added).[8]  "[T]he district court has discretion to reduce or deny liquidated damages ***if the employer shows*** to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the FLSA."  *Id*. (quoting *Alvarez*

---

[8]"The Equal Pay Act amended § 206 of the FLSA to prevent pay discrimination based on sex, and the FLSA's statute of limitations and liquidated damages provisions apply to EPA claims."  *Alvarez Perez*, 515 F.3d at 1164 (citing 29 U.S.C. §§ 206(d)(3), 216(b), 260).

*Perez*, 515 F.3d at 1163 (quoting 29 U.S.C. § 260))(emphasis added; internal quotations and footnote omitted).  Section 260 provides –

> In any action commenced prior to or on or after May 14, 1947 to recover unpaid minimum wages, unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. § 201 et seq.], if the employer shows to the satisfaction of the court that the act or omission giving rise to such action was in good faith and that he had reasonable grounds for believing that his act or omission was not a violation of the Fair Labor Standards Act of 1938, as amended, the court may, in its sound discretion, award no liquidated damages or award any amount thereof not to exceed the amount specified in section 216 of this title.

29 U.S.C. § 260.

The employer has "the burden of proving its entitlement to the safe harbor" of § 260. *Rodriguez v. Farm Stores Grocery, Inc.*, 518 F.3d 1259, 1272 (11th Cir. 2008)(citing *Joiner v. City of Macon*, 814 F.2d 1537, 1539 (11th Cir. 1987)).  To prove good faith, the employer must show that it investigated its obligations under the Equal Pay Act.  *See Ramsey v. Alabama Public Service Com'n*, 86 F. Supp. 2d 1124, 1129-30 (M.D. Ala. 2000)(citing *EEOC v. White and Son Enterprises*, 881 F.2d 1006 (11th Cir.1989)(finding liquidated damages appropriate where defendant "made no effort to investigate the company's legal obligations with respect to employment matters"); *Reeves v. International Telephone and Telegraph Corp.*, 616 F.2d 1342, 1353 (5th Cir.1980)("Good faith requires some duty to investigate potential liability . . . ."), *cert. denied* 449 U.S. 1077 (1981)).

Defendant contends that plaintiff's Motion for Liquidated Damages is due to be denied "because [it] acted in good faith with reasonable belief that it was not violating the

31

Equal Pay Act by raising Plaintiff's salary 45% through a series of merit and equity increases, in accordance with its pay policies." (Doc. 122 at 1.)  However, the decision at issue in this case is not whether defendant *eventually* corrected plaintiff's disparate salary after several years and after she filed a federal lawsuit.  The issues are whether defendant, in good faith, paid plaintiff less than it paid male employees doing the same job and whether it had reasonable grounds for believing that this disparity in pay did not violate the Equal Pay Act.

Defendant relies on its policy regarding limits on raises to support its good- faith-belief defense that it could not raise plaintiff's pay to an equitable level at the time the disparity was discovered.  However, nothing in the record indicates that defendant ever investigated whether it could legally maintain the inequitable salary disparity between plaintiff and male Quality Planners over time while it incrementally reduced the disparity.  Indeed, well-established precedent provides that each paycheck is a violation of the EPA. *Mitchell v. Jefferson County Bd. of Educ.*, 936 F.2d 539, 548 (11th Cir. 1991)("The Eleventh Circuit has long held that '[s]ex based, discriminatory wage payments constitute a continuing violation of the Equal Pay Act.'")(quoting *Hodgson*, 475 F.2d at 1050).  Therefore, defendant could not, in good faith, believe that it could take years to correct plaintiff's unequal pay. Moreover, without *evidence* of an investigation into its potential liability, this court finds that defendant has not shown that it had reasonable grounds for believing its reliance on the policy limiting raises did not violate the Equal Pay Act.  *See Ramsey*, 86 F. Supp 2d at 1129-30.

Plaintiff's Motion for Liquidated Damages, (doc. 110), will be granted.   The court will award plaintiff an amount equal to her EPA damages as part of the judgment against defendant.

### III.  MOTION FOR ATTORNEYS' FEES AND COSTS AND MOTION FOR BILL OF COSTS

"In a Title VII suit, 'the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee.'  42 U.S.C. § 2000e-5(k).  A court should not award fees for time spent on unrelated, unsuccessful claims.  *Popham v. City of Kennesaw*, 820 F.2d 1570, 1578 (11th Cir.1987)."  *Shannon v. BellSouth Telecommunications, Inc.*, 292 F.3d 712, 717 (11th Cir. 2002)

Unlike an action under Title VII, under the EPA, the court ***must*** award attorneys' fees to a prevailing plaintiff.  *See* 29 U.S.C. § 216(b)("The court in such action ***shall***, in addition to any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action." (emphasis added)); *see also Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 262 n.34 (noting that FLSA is "mandatory in terms of awarding attorneys' fees" under 29 U.S.C. § 216(b)).

The court finds that an award of attorneys' fees and costs is appropriate in this case. The award, however, will be limited to fees and costs associated with plaintiff's Title VII gender discrimination claim and her EPA claim.  Given the on-going nature of this action and defendant's assertion that it intends to file yet more motions after judgment is entered in this case, (*see* doc. 112 at 1), the court declines to determine the amount of attorneys' fees and

costs at this time.  Therefore, the amount of such award will be determined following defendant's post-judgment motions.[9]

Plaintiff's Motion for Award of Attorneys' Fees and Costs, (doc. 111), will be granted and the Judgment in this case will contain an award of Attorneys' Fees and Costs in an amount to be determined following resolution of defendant's post-judgment motions. Plaintiff's Motion for Bill of Costs, (doc 116), will be denied, without prejudice.  Plaintiff may refile her Bill of Costs within 20 days after entry of Judgment.  *See* N.D. Ala. L.R. 54.1.

## IV. <u>MOTION FOR PREJUDGMENT INTEREST</u>

Plaintiff asks the court to award her prejudgment interest.  (Doc. 117.)  Defendant argues that the court should deny plaintiff's Motion for Prejudgment Interest or limit the award to interest on $24,000, the amount the jury awarded for the EPA claim, and not $34,000, the total amount determined by the jury.  (Doc. 120 at 2.)  The jury found in favor of plaintiff on her Title VII gender discrimination claim, for $10,000, and her EPA claim, for $24,000.  (Doc. 103 ¶¶ 3, 8.)

Prejudgment interest is not available on a FLSA claim when the court awards liquidated damages.  *Joiner*, 814 F.2d at 1539 (citing *Brooklyn Savings Bank v. O'Neil*, 324

---

[9]At the appropriate time, plaintiff may file renewed Motion for Attorney Fees and Bill of Cost.  Fed. R. Civ. P. 54(d)(2)(B)(i)(Motion for Attorney's Fees must be filed 14 days after the entry of judgment; N.D. Ala. L.R. 54.1("Requests for taxation of costs (other than attorneys' fees) under Fed. R. Civ. P. 54(d) shall be filed with the Clerk within 20 days after entry of judgment).  These renewed pleadings may refer back to documents previously filed in the record.  However, the amounts requested should be amended to reflect only those fees and costs associated with plaintiff's Title VII gender claim and her EPA claim.

U.S. 697, 715 (1945); *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 469 (5th Cir. 1979)).  Therefore, any prejudgment interest is available only on that part of the jury's verdict representing the Title VII award, or $10,000.  Defendant argues, however, that this court should find that the $10,000 jury verdict represents double recovery of the EPA verdict of $24,000.  The court declines to address this issue in response to plaintiff's Motion for Prejudgment Interest.[10]

Defendant also contends that, if this court awards prejudgment interest, the rate of such interest shall be "the weekly average 1-year constant maturity Treasury yield."  (Doc. 120 at 4.)  Plaintiff contends that the amount of interest should be "the IRS prime rate[, which] is the underpayment rate during the relevant time period from February 1, 2005, to the date of judgment with each paycheck calculated."  (Doc. 117 at 5.)  She also asks the court "to award prejudgment interest and to further order the parties to agree to an amount for prejudgment interest or to submit separate calculations of interest for the court's determination."  (*Id*. at 7.)

The court will grant plaintiff's Motion for Prejudgment Interest in part and will award interest on that portion of the jury's verdict representing the back-pay awarded on her Title VII claim.  Moreover, the court will order the parties to submit an agreed amount of interest or to submit separate proposed calculations of the amount of interest.

---

[10]The court notes that plaintiff presented evidence that plaintiff's total backpay was $33,684.63.  (*See* Pl. Ex. 80.)

## CONCLUSION

For the foregoing reasons, the court is of the opinion that the record contains sufficient evidence to submit plaintiff's claims to the jury.  Therefore, defendant's Motion for Judgment as a Matter of Law, (doc. 103), will be denied.  Moreover, plaintiff's Motions for Liquidated Damages, (doc. 110), and her Motion for Attorneys' Fees and Costs, (doc. 111), will be granted.  Her Motion for Prejudgment Interest, (doc. 117), will be granted in part and denied in part.  Her Motion for Bill of Costs, (doc. 116),  will be denied without prejudice.  An Order in conformity with this Memorandum Opinion and a Judgment on the jury's verdict will be entered contemporaneously with this Memorandum Opinion.

**DONE**, this the 29th day of September, 2009.

_Sharon Lovelace Blackburn_
SHARON  LOVELACE  BLACKBURN
CHIEF UNITED STATES DISTRICT JUDGE